[L.A. No. 30839. Nov. 27, 1978.]

GOOD GOVERNMENT GROUP OF SEAL BEACH, INC.,
et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
THOMAS R. HOGARD, Real Party in Interest.

674

**COUNSEL**

Richards, Watson, Dreyfuss & Gershon, Glenn R. Watson, Mitchell E. Abbott, Gary L. Gillig and Robert H. Powsner for Petitioners.

No appearance for Respondent.

Jacque Boyle for Real Party in Interest.

**OPINION**

**MOSK, J.**—The trial court denied defendants' motion for summary judgment in an action for libel, and they seek a writ of mandate to compel the court to grant the motion.

At the time the allegedly libelous publication appeared, Thomas A. Hogard, real party in interest, was a councilman in the City of Seal Beach. The article was written by the vice president of a citizens' organization known as the Good Government Group of Seal Beach, Inc. (Good Government), published in a local homeowners' association newsletter in February 1971, and was also distributed to the general public as a flyer. It stated that Hogard and two other city councilmen, Fuhrman and Baum, referred to as "the combine," had "extorted by blackmail" $100,000 from a development company. Hogard, charging the article was libelous, named the author of the article, the association, Good Government, and various others as defendants in his complaint.

At the time of publication, the municipality was in the throes of political turmoil and strife that was likely to ulcerate the most tranquil dispositions. Hogard served as a councilman from July 1970 until he was recalled in August 1971. In the months preceding publication, the city manager and city attorney had been discharged, recall petitions had been filed against Fuhrman, and notices of intention to circulate recall petitions against Hogard and Baum had been filed. The majority of the council refused to authorize the recall election of Fuhrman, and a mandate proceeding was instituted to compel it to do so. The council engaged an attorney to investigate the recall campaign, but the city treasurer refused to pay the attorney's fees, and the council majority sought to file charges with the grand jury against the treasurer. One member of the council resigned, and a notice of recall was filed against the city clerk.

On October 30, 1970, the city revoked building permits previously issued to R & B Development Co. to construct an apartment project, on the ground that the permits were issued in error, were based upon incorrect information, and violated city ordinances. The city council enacted an ordinance imposing a temporary moratorium on construction in the area of the development pending completion of an environmental study, giving as its reasons that the project had not been properly investigated and no consideration had been given to its effect upon the environment. The developer filed suit against the city. On November 23, in an executive session of the city council held to discuss the lawsuit, Hogard, Fuhrman and Baum proposed that if the developer would agree to dismiss the suit and to pay the city $100,000, it should be permitted to proceed with its project in accordance with the plans previously filed. At

that time Holden, a member of the city council, characterized this proposal as "outright extortion" and "blackmail."

At a public meeting following the executive session, Baum announced the terms of the settlement and Holden stated, "I don't like the idea of using a hatchet on people after you have made an agreement but I'll vote for the matter in order to get the work started and stop the harassment." No changes in the building plans were made and no environmental studies were conducted between the time the permits were revoked and their reinstatement pursuant to the agreement. As part of the settlement, the developer agreed to rent the apartments to married couples as well as single persons.[1]

The article at issue charged Hogard, Fuhrman and Baum with "chicanery and machinations" with respect to their conduct in the recall of Fuhrman, described their conduct as "recalcitrant," and warned that they would pay for their "infamy."

The most damaging references to Hogard were contained in the following paragraph: "This is the same combine which extorted by blackmail $100,000 from the R & B Development Company. For its thirty pieces of silver the combine agreed to forgo its concern for the City's ecology, pollution and strain on our sanitation system that Baum had so sanctimoniously raised during his campaign and in City Council meetings. For economical reasons the R & B Development Company submitted to the 'holdup' and agreed to drop its multi-million dollar suit against the City so that it could begin the construction of apartment buildings in the downtown section of the City."

Hogard filed suit, charging that the statements in the article were false, that defendants knew they were untrue or acted with reckless disregard of whether or not they were false, that they intended the statements to be understood by the public as charging him with crime, and that the public so understood them. He alleged that as a result of the charges contained

---

[1]In January 1971, shortly before publication of the article, Hogard, in an attempt to persuade voters not to sign recall petitions against him, declared in a local publication that one of his accomplishments was the "brinkmanship" exercised to "persuade" R & B Development Co. to include married couples as tenants in the apartment complex. In addition, he stated that residents of the city should not be burdened with the additional cost of city services engendered by large apartment projects, and that a "renegotiated agreement" with the developer required it to pay $100,000 as an environmental reserve tax.

in the article, he was unable to find employment, was defeated in the recall election, and suffered nervous shock and strain. The complaint sought general damages in the amount of $500,000, special damages of $31,000, and punitive damages of $500,000.[2] Defendants moved for summary judgment, filing affidavits in support of their motion, setting forth the facts outlined above; Hogard filed counteraffidavits. As we have seen, the motion was denied by the trial court.[3]

In this proceeding, defendants do not assert that Hogard has ever committed extortion or blackmail, nor do they deny that the statements are libelous if they are viewed as charging the commission of such crimes; rather, they contend, the statements referring to extortion and blackmail, when viewed in the context of the article as a whole and the tense political situation which existed in the city at the time the article was published, could not have been viewed by a reader as literally charging Hogard with crime, but amounted merely to sharp criticism of his conduct, using figurative language. Moreover, they contend, even if, by giving the words used in the article a "strained and unintended interpretation" they may be read as literally charging Hogard with the commission of crimes, nevertheless their motion for summary judgment should have been granted because the affidavits offered by Hogard in opposition to the motion failed to show that the statements were made with actual malice, as that term is defined in *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412].

We begin our analysis of these contentions with the decision in *New York Times,* which established the principles applicable to an action for libel brought by a public official. There, an elected official in Alabama alleged that he had been libeled by a newspaper advertisement which

---

[2] A second cause of action alleged that Hogard had sought a retraction, that defendants had published a retraction which did not include a correction of the use of the word "infamy" in the article, and that the use of that term was libelous. The complaint also contained a third cause of action for conspiracy to libel Hogard.

[3] Defendants assert that their motion should have been granted because both they and Hogard agreed that there were no triable issues of fact. (Citing *Burke Concrete Accessories, Inc.* v. *Superior Court* (1970) 8 Cal.App.3d 773 [87 Cal.Rptr. 619].) They rely upon the circumstance that Hogard also filed a motion for summary judgment and assert that this motion amounted to an admission by him that there were no issues of fact to be tried. Hogard's motion was denied, but not on the merits. In any event, the trial court was not required to accept the characterization of the parties as to what matters constituted issues of fact or law. As we shall see, the court correctly concluded that summary judgment was inappropriate because there remain issues to be determined by a jury.

contained false statements regarding his official conduct. The Supreme Court reversed a judgment in his favor, holding that it violated the First and Fourteenth Amendments to the United States Constitution.

The court reasoned that the advertisement qualified for constitutional protection because it expressed a grievance regarding one of the major issues of the time, that erroneous statements are inevitable in free debate and must be protected if freedom of expression is to have "breathing space," and that neither factual error nor defamatory content removes criticism of the conduct of a public official from the protection of the Constitution. ■ It concluded that a public official may not recover damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice. That term was defined as knowledge by the defendant that the statement was false or reckless disregard of whether it was false.

In light of this holding, the two major issues which we must decide are whether the statements complained of constituted false statements of fact, and whether a sufficient showing of malice was made to justify the conclusion that the issue must be decided by a jury.

In *Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596 [131 Cal.Rptr. 641, 552 P.2d 425], we discussed the difference between a statement of fact and a statement of opinion in an action for libel. There, the defendant corporation issued a bulletin in a labor dispute, stating that union officers were "apparently" willing to sacrifice the interests of the members of the union to further their personal ambitions.

■ We reasoned that "there is no such thing as a false idea" (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 339 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997]), and that an essential element of an action for libel is a false statement of fact. An allegedly defamatory statement may constitute a fact in one context but an opinion in another, depending upon the nature and content of the communication taken as a whole. "Thus, where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion." (17 Cal.3d at p. 601.)

Our conclusion was that the charges were neither factual in nature nor calculated to induce the audience to which they were addressed to conclude that they were factual, that they did not impute crimes or dishonesty to plaintiffs, and that they were of a kind typically generated in a spirited dispute in which the loyalties and subjective motives of rivals are attacked and defended.

■ In our analysis of the character of the article involved here, we note, first, that the words "recalcitrant," "machinations," "infamy," and others of similar import represent statements of opinion as to Hogard's conduct and, as such, they may not be made the basis for a libel action. These terms, as used in the article, may be "epithets, fiery rhetoric or hyperbole" but they are, to paraphrase *Gregory,* of a kind frequently generated in an acrimonious dispute in which the integrity and subjective motives of competitors are under attack. Since they amount to a characterization of the conduct of Hogard with regard to the matters described in the article, they are merely statements of opinion and not actionable.

■ But a conclusion is less certain with respect to the statements in the paragraph quoted above. As to those expression, we cannot accept the position of Hogard that they are clearly factual and charge him with committing extortion or blackmail, nor do we accede to defendants' claim that they constitute opinion as a matter of law.

The article omits any reference to the fact that the $100,000 was paid by the developer *to the city*; thus it could be understood as charging that Hogard and his fellow councilmen personally pocketed the funds. On the other hand, the general tenor of the article, when viewed in the light of the political turmoil which pervaded the city at the time of its publication, and the placement of the offending paragraph in the middle of a lengthy and vehement denunciation of the alleged official misdeeds of "the combine" could be read to suggest that the references to "extortion" and "blackmail" did not charge Hogard with committing those crimes, but were only a caustic and strident characterization of Hogard's public acts with reference to the developer's project. The fact that the city had received the $100,000 payment in settlement of the dispute with the developer was public knowledge. Hogard himself had listed the exaction of the payment as one of his accomplishments in office in a statement circulated to local residents, and the suggestion in the article that the developer agreed to drop his lawsuit against the city is itself some

indication that it was the city rather than "the combine" which benefited from the payment.

In our view the article is ambiguous, and we cannot as a matter of law characterize it as either stating a fact or an opinion. In these circumstances, it is for the jury to determine whether an ordinary reader would have understood the article as a factual assertion charging Hogard with crime, or whether the statements were generally understood as an opinion respecting his public conduct in regard to the development project.

■ This conclusion is not contrary to our statement in *Gregory* that the distinction between fact and opinion is a question of law; that remains the rule if the statement unambiguously constitutes either fact or opinion. Where, as here, however, the allegedly libelous remarks could have been understood by the average reader in either sense, the issue must be left to the jury's determination. (Cf. *Mellen* v. *Times-Mirror Co.* (1914) 167 Cal. 587 [140 P. 277].)

Defendants rely upon *Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6 [26 L.Ed.2d 6, 90 S.Ct. 1537], in which the use of the word "blackmail" was held not libelous as a matter of law. The defendants in that case published a weekly newspaper in which they reported that at a meeting of the city council several persons had characterized the conduct of a developer (concededly a public figure) as constituting "blackmail." As reported in the articles, the developer had proposed that if the city would rezone certain land owned by him to high density, he would agree to the price offered by the city for another tract of land he owned, property which the city wished to acquire for a high school.

The developer claimed that the use of the word "blackmail" was libelous because the defendants knew that he had not committed such a crime. The high court, in reversing the trial court's judgment in favor of the developer, held that, because the newspaper had published a full, fair and accurate account of the debates without distorting the report so as to extract the word "blackmail" from the context in which it was used, and because the developer's proposal was accurately described, it was impossible to believe that a reader who reached the word "blackmail" in the article would not have understood that the criticism was directed at the developer's public and wholly legal negotiating proposals.

"No reader," stated the court, "could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging [the developer] with the commission of a criminal offense. [Fn. omitted.] On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable. Indeed, the record is completely devoid of evidence that anyone in the city of Greenbelt or anywhere else thought [the developer] had been charged with a crime." (398 U.S. at p. 14 [26 L.Ed.2d at p. 15].)

Here, unlike *Greenbelt,* the publication did not describe the background against which the remarks concerning the use of the terms "blackmail" and "extortion" were made. There was no mention of the compromise settlement under which R & B Development Co. agreed to pay the $100,000 to the city, nor any specific mention that the sum was paid to the city rather than to "the combine." Therefore, unlike *Greenbelt,* we cannot say as a matter of law that the terms "blackmail" and "extortion" could not have been and were not understood as charging Hogard with crime. '

Although a triable issue of fact is presented as to whether the publication constituted a factual assertion that Hogard had committed extortion or blackmail, the question remains whether Hogard made a sufficient showing of malice to justify denial of defendants' motion for summary judgment. As we have seen, the test of malice under *New York Times* is whether the defendant knew the statement was false or acted with reckless disregard of whether or not it was false.

Hogard's position in this regard is simple: he argues that since defendants concede that they were aware prior to publication that Hogard had never committed extortion or blackmail, they published the defamatory statements with knowledge of falsity, and thus the test for malice set forth in *New York Times* is satisfied.

We disagree with this proposed simplistic formula. It is undisputed that negligence in the publication of a defamation is insufficient to meet the test of malice under *New York Times.* (*Garrison* v. *Louisiana* (1964) 379 U.S. 64, 78-79 [13 L.Ed.2d 125, 134-136, 85 S.Ct. 209]; *Rosanova* v. *Playboy Enterprises, Inc.* (S.D.Ga. 1976) 411 F.Supp. 440, 448.) If we were to accept Hogard's contention, it would mean that a

defendant who makes a statement which is ambiguous in the sense that it can reasonably be viewed as either fact or opinion, but who neither intends the statement to bear a factual meaning nor believes that it will be understood by the reader in that fashion, will be guilty of libel if a jury later determines that the article was understood in its factual, defamatory sense.

Such a holding would render a defendant liable for a defamatory statement negligently made and would create precisely the chilling effect on speech which the *New York Times* rule was designed to avoid. The Supreme Court made it clear there that the reason for its ruling requiring a showing of malice in libel actions involving the conduct of public officials is that otherwise "would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." Such a rule "dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments." (376 U.S. at p. 279 [11 L.Ed.2d at p. 706].)

If Hogard was to prevail in his view, the result would be a hobbling of free speech by the continuing fear of liability for the use of inexact semantics. The First Amendment protects not only the expression of a political opinion but the choice of words used to convey that opinion.

It is clear that honest belief of the defendant is the touchstone of the privilege enunciated in *New York Times,* and that a statement is entitled to constitutional protection if the words used are ambiguous but the defendant honestly and without recklessness believes that they constitute an opinion or idea. ■ We hold, therefore, that in order to find the requisite malice from the publication of ambiguous words which could constitute either fact or opinion, the jury must find not only that the words were reasonably understood in their defamatory, factual sense, but also that the defendant either deliberately cast his statements in an equivocal fashion in the hope of insinuating a defamatory import to the reader, or that he knew or acted in reckless disregard of whether his words would be interpreted by the average reader as defamatory statements of fact.

Our next inquiry is whether there was a sufficient showing in the present case to meet this standard. ■ Defendants are correct in

asserting that, because unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable. (*Dombrowski* v. *Pfister* (1965) 380 U.S. 479, 486-487 [14 L.Ed.2d 22, 28-29, 85 S.Ct. 116].) Therefore, summary judgment is a favored remedy, and upon such a motion the trial court must determine whether there is a sufficient showing of malice to warrant submission of that issue to the jury. (See, e.g., *Bon Air Hotel, Inc.* v. *Time, Inc.* (5th Cir. 1970) 426 F.2d 858, 864-865; *Time, Inc.* v. *McLaney* (5th Cir. 1969) 406 F.2d 565, 566; *Oliver* v. *Village Voice, Inc.* (S.D.N.Y. 1976) 417 F.Supp. 235, 237; see *Belli* v. *Curtis Pub. Co.* (1972) 25 Cal.App.3d 384, 389 [102 Cal.Rptr. 122].)

■ We believe Hogard has made a sufficient showing of malice to justify consideration of the issue by the jury if it finds that the article was reasonably understood as alleging that Hogard was guilty of crime.

Shortly after the publication of the article, Hogard wrote the association that some of the statements in the article, including the statement relating to extortion and blackmail, were "grossly libelous," and he demanded a retraction. In the March issue of the association publication, a retraction was published, which stated, inter alia, "The use of the words 'extorted' and 'blackmail' were not intended to state or imply that any of the persons mentioned in the article had committed the crimes of 'blackmail' or 'extortion.'" Following this disclosure, the publication printed the statement by Hogard, referred to above, regarding his exercise of "brinkmanship" and persuasion with reference to the R & B Development Co.'s project.[4] According to Hogard's declaration filed in

---

[4]The article stated under the heading "Retraction": "In its February 1971 issue of the College Park News, the College Park Homeowners Association printed an article entitled 'How Much Can the Citizens of Seal Beach Stand?' In this article it was stated, among other things:

"1. 'This is the same combine which extorted by blackmail $100,000 from the R & B Development Company . . . .'

"2. 'He had had (referring to former City Councilman Lloyd Gummere) his fill of the Hogard-Fuhrman-Baum-Robertson daily chicanery and machinations.'

"CPHA, its officers and directors and everyone connected with the publication and circulation of our February 1971 issue, hereby unequivocally retract the quoted excerpts from the above mentioned article. The use of the words 'extorted' and 'blackmail' were not intended to state or imply that any of the persons mentioned in the article had committed the crimes of 'blackmail' or 'extortion.'

"In lieu of the first sentence retracted above, the following statement published by Seal Beach City Councilman Thomas R. Hogard in the January 14, 1971 issue of the Seal Beach-Leisure World 'Penny-saver' is substituted therefor:

" 'The prior administration (referring to the former City Council) made some agreements to the R & B Development Company. We nevertheless managed, with some

opposition to the motion for summary judgment, after the retraction was published he observed the author of the original article and other members of Good Government distributing a flyer of the article as originally printed.

In our view, a jury could conclude from this evidence that at least some of the defendants were aware that the words used in the article could be interpreted as defamatory statements of fact instead of "allegorical language . . . voicing a vigorous political opinion, in strident tones," as defendants claim.

█ Finally, defendants assert that Hogard is not entitled to punitive damages under section 3294 of the Civil Code[5] because that provision is unconstitutional as applied to a libel action in which the *New York Times* privilege applies. (Citing *Maheu* v. *Hughes Tool Company* (C.D.Cal. 1974) 384 F.Supp. 166; but see *Appleyard* v. *Transamerican Press, Inc.* (4th Cir. 1976) 539 F.2d 1026.) This issue was not raised by defendants in their motion for summary judgment, and we need not reach it at this preliminary stage of the proceeding.

The peremptory writ of mandate is denied.

Tobriner, J., Clark, J., Richardson, J., and Manuel, J., concurred.

**NEWMAN, J.**—I dissent. That often there are quarrels among town residents, and that passions of election politics sometimes run high, hardly should shock this court. Almost never, I believe, should judges attempt to monitor those conflicts.

The majority opinion's third paragraph summarizes the 1970-1971 "turmoil and strife" in Seal Beach. The version presented, however, is bowdlerized. For more picturesque accounts the appendix that counsel filed with the Court of Appeal on January 14, 1977, must be examined; e.g., the lengthy declarations of Thomas McNew ("two months of

"Brinkmanship" on our part, to "persuade" R & B to abandon . . . ,' and '. . . As an example a renegotiated agreement with R & B Development Company requires them to pay $100,000 . . .' "

[5]Section 3294 of the Civil Code provides, "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

sensational hearings involving . . . a Seal Beach dance hall . . . found to be involved in teen-age drug and other abuses") and Charlotte Shuman ("Hundreds of concerned citizens turned out in force to attend council meetings for many weeks"); and see too plaintiff's lengthy flyer "It's Your Decision," with its paragraphs on "HELL, HATE AND HARRANGUE."

The words my colleagues find most offensive are "blackmail" and "extorted." They were used on November 23, 1970, at a city council meeting, by a council member who here declares that "Councilman Gummere joined me in this characterization" and "No one present denied my statement." They then appeared in the second column on an inside page of the February 1971 issue of the *College Park News,* in a two-and-a-half column article entitled "How Much Can the Citizens of Seal Beach Stand?". And during subsequent weeks that article apparently was photocopied and distributed as a one-page flyer.

For possible future reference I append the article to this opinion (and I am sorry that portraying its truly political and nondefamatory flavor more accurately, by photocopying instead of printing, seems unfeasible here).

The California Constitution declares, "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right." (Art. I, § 2.) Was there "abuse" here? I think not, given the turmoil and strife and the long-built-up heat of the local election campaign. I have no precise image of the "ordinary" or "average" reader, but I do not accept the majority's conclusion that a jury should decide "whether an ordinary reader would have understood the article as a factual assertion charging Hogard with crime." Nor would I assign to a jury the question whether "defendant either deliberately cast his statements in an equivocal fashion in the hope of insinuating a defamatory import to the reader, or . . . knew or acted in reckless disregard of whether his words would be interpreted by the average reader as defamatory statements of fact."

That kind of jurying may be appropriate for noncampaign settings. Those prescriptions should not be used, however, as formulas that permit judges and juries in cases like this to chill the speech of vehemently controversial electioneering.

Finally, the majority accord no significance to the fact that the words claimed to be defamatory seem first to have been used by an elective

official at an official meeting. Is it conceivable that the criticized article could be adjudged libelous had it stated, "This is the same combine which, *as Councilman Holden observed at the November 23d meeting,* extorted by blackmail, etc.?"[1]

## APPENDIX

### HOW MUCH CAN THE CITIZENS OF SEAL BEACH STAND!

by
Albert Del Guercio,
Vice President of Good Government
Group of Seal Beach

The citizens of Seal Beach finally had their day in court and the Robertson-Baum-Fuhrman-Hogard combine was dealt a mortal blow. Superior Court Judge Van Tatenhove, after days of hearings, issued an order requiring the recalcitrant councilmen—Baum, Fuhrman and Hogard to set a date for the recall of Fuhrman. In so doing the Judge found that Jody Weir, the City Clerk, had properly performed the duties of her office in certifying as valid and sufficient the recall signatures of over 50% of Fuhrman's councilmanic district. It overruled Bentson's inadvisable contention that the law required 25% of the signatures of the voters of the entire City.

Notwithstanding the favorable court decision, the combine continued to deny the citizens their rights, and instructed Bledsoe (Robertson's former attorney) to file a notice of appeal. This would have had the effect of stalling the recall for months if not a year. This was too much for Councilman Lloyd Gummere to stomach. Notwithstanding his long record of outstanding public service he had been harassed, maligned and his motives impugned by the combine. He had had his fill of the Hogard-Fuhrman-Baum-Robertson daily chicanery and machinations. So at the January 4th meeting of the City Council it was announced that he had reached an agreement with the combine whereby he would resign as councilman and the combine would drop the appeal and set a date for the Fuhrman recall election and the election of his successor. The date of the recall election was thereafter set for March 30, 1971.

Thus as a result of the sacrifice of the venerable senior councilman, the people of Seal Beach will be permitted to exercise its sovereignty over its public servants. But it will be difficult to find a man to fill Mr. Gummere's (affectionately known as "Pop") place. The combination had needlessly spent over fourteen thousand dollars of the taxpayers money to fight Fuhrman's battle and to frustrate the will of the people. In addition, the combine by its unjustified action compelled the Good Government Group to raise over twelve thousand dollars in legal fees to fight the people's battle. The money is coming from small

---

[1] The "Answer of Thomas R. Hogard" that the majority opinion describes in its first footnote, which preceded petitioner's allegedly libelous article, seems to have been exactly what its title implies; i.e., plaintiff's answer to protests at the November 23d council meeting and elsewhere. Does he not say, in effect, that he engaged not in what council colleagues loosely described as blackmail and extortion but rather in "brinkmanship" and "persuasion." (The quotation marks are his.) The legitimate inference is that, until the article as a whole began to have an observable impact on votes, he knew very well that he had been charged with neither criminal blackmail nor criminal extortion.

Compare Mayor George Moscone's recent comment at the July 10th meeting of the San Francisco Board of Supervisors, as reported on page 1 of the S. F. Chronicle, July 11, 1978:. " 'There's never been a greater *hijack* in the history of the board,' said the mayor." (Italics added.)

donations from thousands of concerned citizens of Seal Beach. This is the price we had to pay in order to oust irresponsible men from office and restore honest and responsible government in the City. The day the combine compelled the resignation of one of its most respected and beloved councilman to insure the people their rights, will go down as a day of infamy.

This is the same combine which extorted by blackmail $100,000 from the R & B Development Company. For its thirty pieces of silver the combine agreed to forgo its concern for the City's ecology, pollution and strain on our sanitation system that Baum had so sanctimoniously raised during his campaign and in City Council meetings. For economical reasons the R & B Development Company submitted to the "holdup" and agreed to drop its multi-million dollar suit against the City so that it could begin the construction of apartment buildings in the downtown section of the City.

But the combine will pay for its infamy and lose its stranglehold on the City. Notices of intention to recall have been served on Baum and Hogard and circulation of petitions have commenced. For the first time the Fuhrman-Hogard-Baum combine have dropped their arrogance and are running scared. They were given an opportunity in the recall notice to answer specific charges of misconduct and illegal activities. They elected not to do so but instead chose to set up a smoke screen by falsely claiming to have benefited the City of Seal Beach during their incumbency. They enshrined themselves in a cloak of innocence and humility that ill becomes them. From now to the date of the election you will hear a lot of political hog-wash from this combine. It appears that Robertson will have to move elsewhere to impose his will on an elective body.

---

**BIRD, C. J.,** Dissenting.—The First Amendment protects the expression of political opinions—the polite utterance along with the rude remark, the sober judgment along with the emotional exaggeration. However, the majority find that an article criticizing the official conduct of three city councilmen may have gone beyond the expression of opinion to include *one* false statement of fact. This, the majority conclude, warrants denial of defendants' motion for summary judgment.

I cannot agree. When read in context, the offending phrase, which supposedly accuses the councilmen of *criminal* blackmail, emerges clearly as a literary device for ridiculing their *political* conduct. Beyond the instant case, I fear the majority opinion will have a "chilling effect" on the exercise of legitimate First Amendment rights. Every critic of government must now unduly restrain his or her language, lest some imaginary reader mistake literary license for criminal allegations.

I

This country has "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (*New*

*York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 270 [11 L.Ed.2d 686, 701, 84 S.Ct. 710, 95 A.L.R.2d 1412].) The constitutional guarantees of free speech and press assure every person "the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation." (*Baumgartner* v. *United States* (1944) 322 U.S. 665, 674 [88 L.Ed. 1525, 1531, 64 S.Ct. 1240].) It is, after all, a sign of a free society that politics still engenders passion—and the excesses of passion. Therefore, courts wisely refuse to prescribe rules of etiquette for political parlance. "Rhetorical hyperbole," "vigorous epithet[s]" and opinions couched "even in the most pejorative terms" are all in order. (*Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6, 14 [26 L.Ed.2d 6, 15, 90 S.Ct. 1537]; *Letter Carriers* v. *Austin* (1974) 418 U.S. 264, 284 [41 L.Ed.2d 745, 761-762, 94 S.Ct. 2770].) For we must recognize that *how* one talks about a political candidate is often *what* one wants to say. Therefore, to restrict the language of political dialogue is ultimately to restrict the dialogue itself. The First Amendment was promulgated in recognition of this fact.

Unlike an expression of opinion, a false statement of fact may be the basis of a defamation action. Unfortunately, few words are immutably cast as either statements of fact or opinion.[1] "[W]hat constitutes a statement of fact in one context may be treated as a statement of opinion in another . . . ." (*Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425].) Therefore, a court looks to see whether a particular expression is one of fact or opinion. In making this determination, courts look to the nature and content of the communication and to the knowledge and understanding of the individuals to whom the publication is directed. " 'A publication claimed to be defamatory must be read and construed in the sense in which the *readers to whom it is addressed* would ordinarily understand it. So the whole item . . . should be read and construed together, and its meaning and signification thus determined.' " (*Washington Post Co.* v. *Chaloner* (1919) 250 U.S. 290, 293 [63 L.Ed. 987, 989, 39 S.Ct. 448], italics added; accord *Hoffman* v. *Washington Post Co.* (D.D.C. 1977) 433 F.Supp. 600, 602, fn. 1; *Scott* v. *McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277, 291, fn. 11 [112 Cal.Rptr. 609]; see Eldredge, The Law of Defamation (1978) § 9, pp. 44-45.)

---

[1] As the United States Supreme Court has observed: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." (*Towne* v. *Eisner* (1918) 245 U.S. 418, 425 [62 L.Ed. 372, 376, 38 S.Ct. 158], quoted in *Bon Air Hotel, Inc.* v. *Time, Inc.* (5th Cir. 1970) 426 F.2d 858, 867, fn. 17.)

The events and environment which precipitate the publication must also be examined. "[W]here potentially defamatory statements are published in a public debate . . . or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion." (*Gregory* v. *McDonnell Douglas Corp., supra,* 17 Cal.3d at p. 601; see *Letter Carriers* v. *Austin, supra,* 418 U.S. at pp. 284-286 [41 L.Ed.2d at pp. 761-762].)

This is particularly relevant where a heated political controversy prompts the publication. The United States Supreme Court has observed that in the midst of such political campaigns " '[c]harges of gross incompetence, disregard of the public interest, communist sympathies, and the like usually have filled the air; and hints of bribery, embezzlement, and other criminal conduct are not infrequent.' " (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at p. 273, fn. 14 [11 L.Ed.2d at p. 702].) As a result, courts must decide whether the challenged language constitutes a statement of fact in "light of the usual political hyperbole customarily encountered when political figures clash on controversial public matters." (*Scott* v. *McDonnell Douglas Corp., supra,* 37 Cal.App.3d at p. 291.)

## II

Appellate courts are required to " 'make an independent examination of the whole record' " to guarantee that these principles "have been constitutionally applied." (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at p. 285 [11 L.Ed.2d at p. 709].) Consider the record. In July 1970, Morton Baum and Thomas Hogard assumed their offices as two of the five councilmen for the City of Seal Beach. Less than a month later, Baum and Hogard joined with incumbent Councilman Conroy Fuhrman to fire the city manager and city attorney. A citizens' group claimed this violated the city charter and promptly filed a notice of intention to circulate recall petitions against Fuhrman.

The city manager had been investigating charges of misconduct and drug abuse at a teenage dance hall operated by William Robertson. This investigation was continued by the interim city manager, who found the charges to be true and suspended the dance hall's license. Robertson appealed to the city council, and public hearings were held over a

two-month period. Baum refused to disqualify himself despite his close personal relationship with Robertson. In a final 3-2 vote, Baum, Hogard and Fuhrman united to reject the city manager's findings.

Another controversy began on October 21, 1970, when the City of Seal Beach issued building permits for the construction of an apartment complex by R & B Development Company. On October 30th, these permits were revoked because the final plans had not been fully examined and approved. On November 2d, a building moratorium in the area encompassing the development project was passed 3-2 by the city council because ". . . absolutely no investigation, study, evaluation or consideration was made or given to the possible adverse, or even catastrophic effects that the implementation of the [Redevelopment] Project Plan might have upon the quality and purity of the environment . . . ." No building permits were to be issued until environmental studies had been completed. The R & B Development Company filed suit seeking the reissuance of the building permits, an injunction against the enforcement of the moratorium, and damages.

At an executive session on November 23d, the council reversed itself and exempted the R & B Development Company from the moratorium. The building permits were immediately reissued in exchange for the development company's agreement to pay $100,000 to the city, to drop its lawsuit, and to rent to married as well as single persons. The development company made no changes in its building plans and no environmental studies were conducted. Councilman Holden, joined by Councilman Gummere, charged that the city's activities amounted to "extortion" and "blackmail." Nevertheless, a majority of the council approved the settlement that evening after its terms were discussed in a public council meeting.

In August 1970, petitions were circulated to recall Fuhrman, and 6,900 signatures were submitted, including 55 percent of the district represented by Fuhrman. Although the required number of signatures were certified by the city clerk, Baum and Hogard voted against setting a date for the recall election.[2] A mandate proceeding, initiated by the Good

---

[2]Baum, Hogard and Fuhrman also voted to retain at public expense the attorney who had represented Robertson in the dance hall hearings. He was asked to investigate the recall movement. When the city treasurer questioned the legality of this act and refused to pay the attorney's fees, Baum, Hogard and Fuhrman instituted civil suit. The superior court upheld the treasurer's action.

Government Group, was filed requesting the court to order the council to set an election.

In December 1970, a recall election was ordered by the superior court, but Baum, Hogard and Fuhrman filed an appeal. Councilman Gummere, who had consistently opposed Baum, Hogard and Fuhrman, offered to resign if the recall election were allowed to go forward. This offer was accepted, and the Fuhrman recall election was set. In January 1971, notices of intent to circulate recall petitions were filed against Hogard and Baum. Fuhrman was recalled by a 6-1 margin in March, and Hogard was recalled by two-thirds of the electorate in August.

These events were reported in the defendants' monthly newsletter. In front page articles during November and December, the newsletter detailed the "arbitrary actions," "irresponsible" conduct and "machinations" of the "combine" (Baum, Hogard and Fuhrman). A third-page article appearing in the February issue formed the basis of this action by real party in interest, Hogard.[3]

The article discussed the conduct of Hogard, Baum and Fuhrman, denominated the "combine," in their capacity as public officials. They were criticized for expending public funds to fight the Fuhrman recall effort, refusing to set a date for the recall election, and forcing another councilman to resign in exchange for setting a date for the recall election. The article deemed the "combine's" performance of their official duties "recalcitrant" and "irresponsible." Their conduct was denigrated as "daily chicanery and machinations," their actions were considered "infamy." The article concluded that "the combine will pay for its infamy and lose its stranglehold on the City" through recall elections. Readers were warned to expect to hear "a lot of political hog-wash" from the "combine" in defense of their conduct as the recall elections approached.

The paragraph containing the words found objectionable by the majority is buried in the middle of the article.[4] The subject of that

---

[3]The article is appended to the dissenting opinion by Justice Newman (*ante,* pp. 688-689).

Fuhrman filed suit based on the same article. Defendants' motion for summary judgment was granted and an appeal is pending. (*Fuhrman v. Day* (2 Civ. 50641).)

[4]The article's fourth paragraph states: "This is the same combine which extorted by blackmail $100,000.00 from the R & B Development Company. For its thirty pieces of silver the combine agreed to forgo its concern for the City's ecology, pollution and strain on our sanitation system that Baum had so sanctimoniously raised during his campaign and in City Council meetings. For economical reasons the R & B Development Company

paragraph was the settlement of the dispute between the city council and R & B Development Company. Specifically the article charged the "combine" with "extort[ing] by blackmail $100,000.00 from the R & B Development Company." The majority argue this court cannot conclude, as a matter of law, that this was only a colorful characterization of the way these councilmen handled the city's business. The majority fasten on the failure to state explicitly that the development company's payment went to the city. This omission supposedly leaves the article ambiguous and creates a jury question: would an ordinary reader have understood that sentence as making the factual assertion that the councilmen had personally pocketed the money? (Maj. opn., *ante,* at pp. 681-683.)

I cannot agree that this article, which clears its ground with the subtlety of a bulldozer, is ambiguous or suggests in any way that the councilmen were guilty of the crime of blackmail. No reader of the article could miss the strident tone and hyperbole used to express the author's criticisms of the councilmen's official conduct. The article was a partisan indictment of their actions, alleging abuses of power and unprincipled conduct. The councilmen were accused of undermining "honest and responsible government," of "arrogance," of "daily chicanery and machinations," and of refusing to answer "charges of misconduct and illegal activities." Surely if the author intended to blacken their reputations by alleging the receipt of a personal payment in exchange for official favors, he would have proclaimed the outrage openly and in the first paragraph, not the fourth.

Moreover, even scant attention to the language of the offending paragraph, set in the midst of this tirade, makes abundantly clear the rhetorical nature of the blackmail charge. The paragraph labeled the $100,000 settlement a " 'holdup.' " By placing the word in quotation marks, the author clearly announced he was castigating the combine for the settlement's unfairness, not its unlawfulness.

The deliberate use of figurative language was again impressed upon the reader when the $100,000 was referred to as "thirty pieces of silver." Judas received thirty pieces of silver, not the three councilmen of Seal Beach. Finally, the paragraph concluded by noting that R & B Development Company dropped its lawsuit *against the city* as part of the settlement. This belies any suggestion that the councilmen personally

---

submitted to the 'holdup' and agreed to drop its multi-million dollar suit against the City so that it could begin the construction of apartment buildings in the downtown section of the City."

pocketed the money. The statement confirms that it was the city, acting through the council, which negotiated and received the payment.

The charges made against the three councilmen are not uncommon in a vigorously contested political campaign. The readers of this newsletter had previously read critical articles about the "combine's" conduct. The electorate was aware of the intense emotions generated by the recall campaign. The dispute between the city and the development company had been discussed at length in two public council meetings and reported in the local press. The settlement was publicly memorialized in the council's minutes and in the agreements and letters between the parties. The majority concede that "[t]he fact that *the city* had received the $100,000 payment in settlement of the dispute with the developer was public knowledge." (Maj. opn., *ante,* at p. 681, italics added.)[5]

In such a highly political context, readers would readily "anticipate efforts by the parties to persuade [them] to their positions by the use of epithets, fiery rhetoric or hyperbole . . . ." (*Gregory* v. *McDonnell Douglas Corp., supra,* 17 Cal.3d at p. 601.) Reasonable readers, who persevered through the article's repeated criticisms, would easily understand that "blackmail" referred to political, not criminal, misconduct. As such, the statement clearly is an expression of opinion characterizing the conduct of a public official. Therefore, it is constitutionally protected as a matter of law.

The case law is in accord. In *Greenbelt Pub. Assn.* v. *Bresler, supra,* 398 U.S. 6, a small weekly newspaper was sued for libel for reporting that individuals at a public city council meeting had charged "blackmail" in connection with a developer's negotiations with the council. The articles, as in the present case, presented only the salient features of the event reported, not a verbatim transcript. Nevertheless, the United States Supreme Court held, as a matter of constitutional law, that the word "blackmail" was not defamatory when spoken at the meeting or printed in the newspaper. (*Id.,* at p. 13 [26 L.Ed.2d at pp. 14-15].) The court

---

[5]The majority see the article's failure to include more details of the settlement as its downfall, presumably because the reader would not understand what actually occurred without more facts. However, Hogard seemed to have little doubt about the public's awareness of the details of the dispute. In response to a notice of intent to circulate petitions to recall him just weeks before this article was published, Hogard published a list of the council's "accomplishments," including their successful effort to " 'persuade' " R & B Development Company, through the exercise of " 'Brinkmanship,' " to allow married couples to rent apartments in the proposed project. He pointed out that the "renegotiated agreement" won by the council also secured an additional $100,000 fee from the developer.

found that the word was "no more than rhetorical hyperbole, a vigorous epithet . . . ." (*Id.,* at p. 14 [26 L.Ed.2d at p. 15].) The language was not defamatory since a member of the audience and a reader of the paper would "have understood exactly what was meant: it was [the plaintiff's] public and wholly legal negotiating proposals that were being criticized." (*Ibid.*) That is equally true here.[6]

In *Gregory* v. *McDonnell Douglas Corp., supra,* 17 Cal.3d at page 603, this court unanimously held accusations that union officers were "willing to sacrifice the interests of the members of their union to further their own political aspirations and personal ambitions" were incapable of supporting a defamation action. Such accusations are as capable of being construed as statements of fact as the statements in the present case. However, this court held that since "the charges are of the kind typically generated in the 'economic give-and-take' of a spirited labor dispute . . . ," they "constituted protected statements of opinion . . . ." (*Id.,* at pp. 603-604.)[7]

---

[6]The trial court in *Thuma* v. *Hearst Corporation* (D.Md. 1972) 340 F.Supp. 867, relied on *Greenbelt* in finding that a libel action could not be based on a press report of a father's lament that the shooting of his son by police was "cold-blooded murder." "It would seem most improbable that persons seeing the words 'cold-blooded murder,' as they were used in the context of the events reported in the articles, would interpret them as meaning premeditated murder. Whatever those words may connote in other circumstances, in this situation they were rather clearly hyperbole expressing the father's most vehement feeling that the shooting was completely unnecessary. . . . [T]heir clear import is that [the victim's] family, friends and neighbors were as angry as they could be because they considered the shooting to have been unjustified and unnecessary. It is that import which would be impressed upon a reader of the articles, and which would prevent him from thinking that the father was charging Thuma with premeditated murder . . . ." (*Id.,* at p. 871; cf. *Curtis Publishing Company* v. *Birdsong* (5th Cir. 1966) 360 F.2d 344.)

[7]In its discussion of the kind of statements entitled to constitutional protection, the *Gregory* court discussed with approval two Court of Appeal decisions involving comments made during political contests. In *Scott* v. *McDonnell Douglas Corp., supra,* 37 Cal.App.3d 277, the trial court granted a demurrer in a lawsuit based on charges by a city councilman "that a city manager would ' "stoop to any form of action in . . . [his] power to . . . stay in office," ' that in a letter released to the press he ' "assume[d] the position of . . . City Dictator," ' that his administration of the city's affairs had descended to a ' "mutinous character," ' and that the people of Santa Monica are not so fortunate as to have ' ". . . a City Manager who is dedicated to efficiently and honestly administer the affairs of the City for the people and through the people's elected representatives . . . ." ' " (*Gregory* v. *McDonnell Douglas Corp., supra,* 17 Cal.3d at p. 602.) In affirming the trial court's action, the Court of Appeal stated: "The fact that plaintiff takes umbrage at the tone and level of criticism directed against him is not sufficient to sustain an action for defamation. The statements in the instant controversy should be considered in light of the usual political hyperbole customarily encountered when political figures clash on controversial public matters. An individual in this country has the right to severely criticize the performance of public officials." (*Scott* v. *McDonnell Douglas Corp., supra,* 37 Cal.App.3d at p. 291.)

Similarly, it has been held that charging a person with the kind of "paranoid thinking that you get from a schizophrenic" was "not capable of a defamatory meaning." (*Fram* v. *Yellow Cab Company of Pittsburgh* (W.D.Pa. 1975) 380 F.Supp. 1314, 1323, 1330.) The court noted that in the context of a television talk show the audience was accustomed to hearing criticism and controversy, and would understand the comment as colorful rebuttal rather than an accusation of mental illness. (*Id.,* at pp. 1329-1331.)[8]

Another recent case held that a broadcast was not defamatory despite the omission of an important statement of fact. The broadcast, entitled "Public Bridges & Private Riches," created the impression that a former member and chairman of the Delaware River Port Authority privately benefited from inside information, failed to reveal conflicts of interest, and abused his public trust. (*Pierce* v. *Capital Cities Communications, Inc.* (3d Cir. 1978) 576 F.2d 495.) The broadcast stated that " 'some Port Authority Commissioners saw an opportunity for enormous profits, profits on land deals . . . .' " (*Id.,* at p. 498.) Land purchases involving plaintiff, who appeared to benefit from the authority's decisions, were described in detail. In describing one transaction, the defendant omitted the date of the plaintiff's purchase, creating the impression that the plaintiff benefitted from inside information. In fact, the land was purchased after the authority's action was public knowledge. Despite the

---

In the second case, *Taylor* v. *Lewis* (1933) 132 Cal.App. 381 [22 P.2d 569], the Court of Appeal affirmed the sustaining of a demurrer in a defamation action based on criticisms of a councilman in the midst of a recall proceeding. "[T]he court found as opinion rather than fact statements that certain councilmen ' "did not consistently serve the best interest of the city," ' ' "usurped the functions of the city manager, dictated appointments in violation of the charter, and forced out of office useful employees of the city," ' ' "had as little respect for sound business usage in their conduct of city affairs as they showed for the charter and the merit system in municipal service," ' did not always ' "take the highest and best bids when selling, and the lowest and best when buying," ' and ' "lacked that conscientious regard for the city's interest which makes of public office a public trust"; . . .' " (*Gregory* v. *McDonnell Douglas Corp., supra,* 17 Cal.3d at pp. 602-603.) Surely these allegations of misfeasance in public office are no less susceptible to construction as statements of fact than the expressions in the present case.

[8]There is an analogous case from this state. In *Yorty* v. *Chandler* (1970) 13 Cal.App.3d 467, 472-473 [91 Cal.Rptr. 709], defendant published a cartoon suggesting plaintiff was "unqualified for high national office" and that plaintiff's contrary view "was so far removed from reality . . . that [his] ambitions could popularly be described as insane, mad, or crazy." Nevertheless, the court found no reasonable person would construe the cartoon other than as an expression of opinion, i.e., the cartoon was "not reasonably susceptible to a defamatory meaning." (*Id.,* at p. 477.) "[M]ere expression of opinion or severe criticism is not libelous, even though it adversely reflects on the fitness of an individual for public office." (*Id.,* at pp. 472-473.) The sustaining of a demurrer was affirmed.

fact that *the failure to include this statement of fact* led to the impression of misconduct and unlawful dealings in office, the court held that the broadcast was "incapable of a defamatory meaning." (*Id.,* at p. 510; cf. *Time* v. *Pape* (1971) 401 U.S. 279, 289-290 [28 L.Ed.2d 45, 52-54, 91 S.Ct. 633].)

The reasoning of these decisions is compelling. The comments were made in the middle of a public controversy, where caustic language, exaggeration and fiery rhetoric are regularly employed. In this context, many comments which might be construed as assertions of fact in a more tranquil setting are found, as a matter of law, to be opinions intended to persuade. The First Amendment protects such statements from judicial incursions. "Any other conclusion would have 'disquieting implications for criticism of governmental conduct,' for it would likely lead to the kind of chilling effect on the media that *New York Times* and its successors directly seek to avoid." (*Pierce* v. *Capital Cities Communications, Inc., supra,* 576 F.2d at p. 510, fns. omitted.)[9]

### III

The majority's reason for affirming the denial of defendants' motion for summary judgment portends a judicial intervention in the area of our free press which is inimical to the principles enshrined in the First Amendment. In holding that a defamation suit will lie because of the alleged failure to make one statement sufficiently explicit, the majority set a course which bodes ill for the future. Their analysis would make editors of judges. The judiciary's red pen is thereby unleashed to strike vexatious language or to demand augmentation according to the judges' image of how the public should be informed.

This will cause publishers to moderate their political commentary and to dilute the intensity of their judgments in order to avoid the shadow of liability cast by this court's opinion. As a consequence, the vigorous and vital public debate essential to a healthy electoral process will be tempered to polite sparring. Today, "good government" is made a double victim.

Petitioners' application for a rehearing was denied December 27, 1978. Newman, J., was of the opinion that the application should be granted.

---

[9]"To deny to the press the right to use hyperbole, under the threat of removing the protective mantle of *New York Times,* would condemn the press to an arid, desiccated recital of bare facts." (*Time, Inc.* v. *Johnston* (4th Cir. 1971) 448 F.2d 378, 384.)