[No. 5422-5-III.   Division Three.   June 26, 1984.]

HENRY BENJAMIN, *Appellant,* v. COWLES PUBLISHING COMPANY, ET AL, *Respondents.*

*Robert F. Ewing* and *Huppin, Ewing, Anderson & Hergert,* for appellant.

*E. Glenn Harmon, Duane M. Swinton, Witherspoon, Kelley, Davenport & Toole, P. Cameron DeVore, Daniel M. Waggoner,* and *Davis, Wright, Todd, Riese & Jones,* for respondents.

GREEN, A.C.J.—This defamation action arises from a column written by Chris Peck and published in the Spokesman–Review concerning a shoplifting incident that occurred in Henry Benjamin's Ben Franklin store in Cheney. Mr. Benjamin, alleging the article was defamatory, sought damages from Cowles Publishing Company, a publisher of the newspaper, and Mr. Peck. A substantial jury verdict for Mr. Benjamin was set aside and a judgment notwithstanding the verdict was entered by the court. Mr.

Benjamin appeals.

The primary issue on appeal is whether the column published by the newspaper was the expression of a constitutionally protected opinion.

Mr. Peck wrote three columns a week for the newspaper. These columns concerned matters of public interest and offered a comment or point of view. He decided to write a column about Washington's shoplifting law, RCW 4.24-.230(2). This law permits a shop owner to collect a minimum of $100 and a maximum of $200 as a civil penalty from parents or legal guardians of unemancipated minors who shoplift. In discussing the law with the juvenile department for Spokane County and perusing the public records, he learned of an incident at the Ben Franklin store in Cheney. It concerned a 13–year–old who took a 42–cent package of gum, was apprehended and Mr. Benjamin, the owner, exercising his right under the law, demanded and received payment of $100 from the parents. Mr. Peck, desiring to raise the question of whether this was a fair law, that is, did the punishment fit the offense, wrote the following article entitled, "Crime, punishment and the $100 wad of gum":

CHENEY, Wash.—The purchase of Cheney's highest–priced bubble gum began one Saturday afternoon as T.J. rode his bicycle home.

Eighth graders may be skinny and frail, but their jaws develop the bite of a great white shark from teenage gumchewing and that afternoon the 13–year–old boy's salivary glands watered for a stick of Bubble Yum.

T.J., as he had done before, parked his bike and went into the downtown Ben Franklin store to peruse the varieties of Bubble Yum, Bubblicious and Hubba Bubba.

Inflation, of course, has blown a big bubble in the price of gum.

And as T.J. dug into his jean pockets for the 42 cents needed to purchase two five–stick packs, he realized he had come up pennies short.

His $5–a–month allowance was running low, and it was three–quarters of a mile home to plead for an advance on next month's stipend.

Being 13 and generally unaware of anything but the saliva in his cheeks, T.J. did something he had never done before.

He slipped two packs of Bubble Yum into his pocket.

Then, rummaging through the penny candy he picked out his favorites, walked to the checkstand, paid for the candy and left.

The store detective followed him out.

"Hand over the gum," the detective said.

"Gum, what gum?" T.J. replied.

Back in the office of store owner Henry Benjamin, T.J. confessed.

Yes, he had pinched 42 cents worth of bubble gum, and he was sorry.

Soon, his parents were sorrier.

The Cheney Ben Franklin store happens to be one of the dozens of retail outlets in Washington to have discovered Washington Law 4.24.230.

The law has nothing to do with criminal prosecution of shoplifting, something store owners have always been able to do.

The law, instead, rests on the civil premise that criminals should repay victims for their crimes.

And it allows any merchant who catches any juvenile shoplifter stealing anything, to demand $100 to $200 from the child's parents.

At the encourgement [sic] of the Washington Crime Watch Office, the past few months many businessmen have begun using the law.

The state has sold them on the idea that it provides a way to recoup the estimated 1–2 percent of gross revenues lost by five–fingered Macks and Marys every year.

So after T.J. lifted 42 cents worth of gum, his mother and father received a demand letter from the Ben Franklin store telling them to pay $100 or go to court.

"Today it's gum; tomorrow it's automobile parts," Henry Benjamin said when asked if he thought the $100 demand letter might be a little stiff for a first–time shoplifter stealing two packs of gum.

"The amount is completely irrelevant," he said. "I have an investment to protect. The only defense I have is to enforce the civil charges of every shoplifter I catch."

That philosophy confused T.J.'s mother, who knew nothing about the law and thought the idea of her son

having a criminal record was enough punishment for his crime.

"Mr. Benjamin said he didn't like doing this, but in lieu [sic] of the fact that hundreds of thousands of dollars are being shoplifted, he had no choice," she said.

"He told me the ones they catch are the only ones they have to defray the costs of their losses."

In other words, T.J.'s parents, because they have a 13–year–old who is not an accomplished shoplifter, get to pay the bill rung up by sharpies who rip off Ben Franklin and get away.

Back at the Ben Franklin, Henry Benjamin got a little defensive.

"Sure, it's quite possible (T.J.) was easier to catch," he said.

"But we recover only a very small loss from shoplifting. We're not punishing people for a pack of gum. We are inflicting the law for shoplifitng [sic]. The word will get around fast."

Word, indeed, is getting around fast among juvenile probation officials who are running into dozens of cases where businessmen are collecting $100 from the parents of two–bit shoplifters.

The probation officals [sic] knew the story of the Spokane high school student who opened a 39–cent package of plastic spoons and removed two. His mother received a $100 demand letter.

And they confirmed that one little girl opened a package of cookies in a Spokane grocery store, ate just one. Yet her parents, too, received a $100 demand letter.

When asked if he could think of a time when the $100 demand letter had been sent out to a habitual teenage shoplifter, Dick Sullivan, president of Spokane's Northeast Accountability Board, a juvenile rehabilitation organization, said he couldn't.

"The ones I've been exposed to haven't been major thefts. In quite a few cases it's a broken home and involves people who aren't familiar with the system."

Confused and unaware that they can appeal the $100 demand letter in court, or often lacking the money to hire an attorney to press their cases, many parents just pay.

T.J.'s did.

They sent $100 for the theft of 42 cents worth of gum

to Henry Benjamin.

"It went right into our bank account," Henry Franklin [*sic*] said.

That's what T.J.'s mother doesn't understand.

"I just get the feeling that the fine wasn't in proportion to the crime," she said. "It's like we're paying for the crimes of 200 other kids."

By chance, the fine was about 200 times higher than the value of the gum.

If the same formula were used by the courts in dealing with car thieves, a first offender who had stolen a $5,000 car would owe $1 million.

Now T.J. is now paying back his parents.

He's working around the yard, chopping wood and doing housework at the rate of $2 an hour.

He eventually will pay $100 for the two packs of bubble gum he pocketed from the Ben Franklin store.

*The question is, who is stealing from whom?*

(Italics ours.) The facts stated in this article are substantially true.

Mr. Benjamin, focusing on the last sentence of this article—"The question is, who is stealing from whom?"—commenced this action claiming the sentence was defamatory of him and libelous per se. He contends a jury question was presented and the verdict should be reinstated. The newspaper, on the other hand, asserts the court properly ruled as a matter of law that the column was an expression of a constitutionally protected opinion justifying entry of a judgment notwithstanding the verdict.

The Court in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), beginning the discussion of a different issue, accorded constitutional protection to the communication of opinions, stating:

We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

(Footnote omitted.) *See also Bose Corp. v. Consumers Union of United States, Inc.*, ___ U.S. ___, 80 L. Ed. 2d 502,

104 S. Ct. 1949, 1961 (1984). Based on *Gertz,* the writers of Restatement (Second) of Torts § 566, at 170 (1976), stated:

A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

Here, all of the facts are disclosed in the article.

■ The determination of whether a communication is one of fact or opinion is a question of law for the court. *Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781 (9th Cir. 1980); *Cibenko v. Worth Publishers, Inc.,* 510 F. Supp. 761, 765 (D.N.J. 1981); *Gregory v. McDonnell Douglas Corp.,* 17 Cal. 3d 596, 552 P.2d 425, 131 Cal. Rptr. 641 (1976); *Emde v. San Joaquin Cy. Cent. Labor Coun.,* 23 Cal. 2d 146, 143 P.2d 20, 150 A.L.R. 916 (1943); *Bucher v. Roberts,* 198 Colo. 1, 595 P.2d 239 (1979); *Burns v. Denver Post, Inc.,* 43 Colo. App. 325, 606 P.2d 1310 (1979); *Goodrich v. Waterbury Republican–Am., Inc.,* 188 Conn. 107, 448 A.2d 1317, 1321 (1982); *Slawik v. News–Journal Co.,* 428 A.2d 15, 17 (Del. 1981); *From v. Tallahassee Democrat, Inc.,* 400 So. 2d 52, 56 (Fla. Dist. Ct. App. 1981); *Pease v. Telegraph Pub'g Co.,* 121 N.H. 62, 426 A.2d 463 (1981); *Kotlikoff v. Community News,* 89 N.J. 62, 444 A.2d 1086, 1088 (1982); *Marchiondo v. New Mexico State Tribune Co.,* 98 N.M. 282, 648 P.2d 321, 330 (Ct. App. 1981); *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 366 N.E.2d 1299, 397 N.Y.S.2d 943, *cert. denied,* 434 U.S. 969, 54 L. Ed. 2d 456, 98 S. Ct. 514 (1977); *Miskovsky v. Oklahoma Pub'g Co.,* 654 P.2d 587, 593 (Okla.), *cert. denied,* 459 U.S. 923, 74 L. Ed. 2d 186, 103 S. Ct. 235 (1982). *See also Greenbelt Coop. Pub'g Ass'n v. Bresler,* 398 U.S. 6, 13–15, 26 L. Ed. 2d 6, 90 S. Ct. 1537 (1970). *Contra, Good Gov't Group of Seal Beach, Inc. v. Superior Court,* 22 Cal. 3d 672, 586 P.2d 572, 150 Cal. Rptr. 258 (1978), *cert. denied,* 441 U.S. 961, 60 L. Ed. 2d 1066, 99 S. Ct. 2406 (1979); *Goodrich v. Waterbury Republican–Am., Inc.,* 448 A.2d at 1322 n.5; *Myers v. Boston Magazine Co.,* 380 Mass. 336, 403 N.E.2d 376 (1980). In making this

determination, a court should consider: (1) the entire article and not merely a particular phrase or sentence; (2) the degree to which the truth or falsity of a statement can be objectively determined without resort to speculation; and (3) whether ordinary persons hearing or reading the matter perceive the statement as an expression of opinion rather than a statement of fact. *Marchiondo v. Brown,* 98 N.M. 394, 649 P.2d 462 (1982); *Marchiondo v. New Mexico State Tribune Co., supra; see also Information Control Corp. v. Genesis One Computer Corp., supra* at 783–84.

Here, the trial judge in granting Mr. Peck's and the newspaper's motion for a judgment n.o.v. considered the last sentence of the article in the context of the entire writing. He observed that each statement of material fact in the column was substantially true and concluded the question asked was a rhetorical one tantamount to an opinion. Since the column was a combination of substantially true statements of fact and a constitutionally protected opinion, he ruled it was not defamatory as a matter of law. We agree.

Considering the article as a whole, Mr. Peck first states what occurred at the Ben Franklin store. He then refers to the shoplifting statute and its applicability to this and other similar incidents. Next, the statutory penalty is then applied to the theft of a car to illustrate the writer's point of view that the statute authorizes an exorbitant penalty. He concludes with a question that challenges the reader to examine the wisdom of legislation which in his view authorizes legalized theft by shop owners from parents of minor children who shoplift. The question in the context of the entire article does not call for a true or false answer. We find the article to be an expression of a constitutionally protected opinion. Therefore, the court was correct in granting the judgment n.o.v.

In light of our holding, we do not reach the other questions raised by the parties.

Affirmed.

THOMPSON, J., concurs.

McINTURFF, J. (concurring)—I am constrained to concur with the result reached by the majority.

The state and federal constitutions protect nonreckless publication of facts which later prove to be false so that legitimate expression is not suppressed. But,

> it is quite a different thing, not involving the same danger of self–censorship, to immunize professional communicators from liability for their use of ambiguous language and their failure to guard against the possibility that words known to carry two meanings, one of which imputes commission of a crime, might seriously damage the object of their comment in the eyes of the average reader.

*Greenbelt Coop. Pub'g Ass'n v. Bresler,* 398 U.S. 6, 23, 26 L. Ed. 2d 6, 90 S. Ct. 1537 (1970) (White, J., concurring). I believe, as Mr. Justice White suggested, that "members of a skilled calling should . . . be held to the standard of their craft and assume the risk of being misunderstood—if they are—by the ordinary reader of their publications." *Bresler,* at 23.

On this jury, at least 10 of 12 ordinary readers of Mr. Peck's article found, on instructions prepared by recognized libel lawyers, that the article was not the expression of an opinion. Instead, they concluded that Mr. Peck was charging Mr. Benjamin with a criminal offense or "an act . . . deserving the contempt of all right minded people". *Burns v. Denver Post, Inc.,* 43 Colo. App. 325, 328, 606 P.2d 1310, 1311 (1979) (Ruland, J., dissenting) (quoting *Smith v. Smith,* 73 Mich. 445, 41 N.W. 499 (1889)). They were not persuaded he was making a critical judgment or voicing an opinion about the shoplifting statute. To the contrary, they believed that with a stroke of his pen and the ink of the presses, he had harmed Mr. Benjamin to the extent of $200,000.

Mr. Peck's ability to write in an interesting, informative and sometimes challenging way is obvious. Yet, in this instance, he, as a professional journalist, knew or should have known his article, although based entirely upon

admitted facts, was structured in such a way that the last sentence, "The question is, who is stealing from whom?", could leave a significant segment of the public with the conclusion Mr. Benjamin was a thief. The jury verdict, reached after proper instruction on the law, bears this out. But the view of *reasonable* readers is not the sole test. The law requires a scrupulous, maybe even technical, study of the entire article—more, perhaps than an ordinary reader would give.

Inherent in freedom of expression are some of our most important rights. Commensurate with these important rights is an equal responsibility—in this case, the responsibility of writing in a way that does not unnecessarily hurt someone.

Journalists, as do all other professionals, owe a standard of care when exercising their constitutionally protected freedom to express a view.

Judicial notice may be taken that in this day of mass communication and the economic availability of voluminous reading materials, the reasonable person may not scrutinize every word in an article in search of the writer's message. Obviously, the jury did not. What in yesteryear's scarce reading materials became quickly discernable rhetoric, today may easily become misleading innuendo.

Although I must concur in this decision, in my opinion, the care exercised by this experienced journalist, as reflected by the jury's verdict, left much to be desired. The damage to Mr. Benjamin easily could have been avoided without lessening the impact of the article.

Review denied by Supreme Court October 5, 1984.