[Nos. D005028, D004354. Fourth Dist., Div. One. Apr. 6, 1988.]

PLANNED PROTECTIVE SERVICES, INC. et al., Plaintiffs and Appellants, v.
GEORGE GORTON et al., Defendants and Respondents.

**COUNSEL**

Mitchell & Mangione and James A. Mangione for Plaintiffs and Appellants.

Luce, Forward, Hamilton & Scripps, Robert G. Steiner and Gregory D. Roper for Defendants and Respondents.

**OPINION**

**BUTLER, J.**\*—Susan Golding and Jamie Brierton were candidates for election to the San Diego City Council. Golding won and Brierton sued her and George Gorton, a campaign helper, for conspiracy and libel arising out of the last-minute mailing to the electorate of a four-page brochure including a page reciting allegations of "violations of trust" and "improprieties" based on conservatorship proceedings involving Brierton. The court granted Golding's and Gorton's motions for summary judgment, dismissed the complaint and awarded attorney fees to Golding. Brierton appeals. We affirm dismissal of the complaint and reverse the attorney fee award.

I

Brierton is a lawyer. From 1979 to 1981, he was director and responsible corporate officer of the San Diego office of Planned Protective Services, Inc. (PPS), a nonprofit corporation with headquarters in Los Angeles. PPS acts as conservator and guardian by court appointment.[1] February 11, 1980, the superior court appointed PPS conservator of the person and estate of Edith Long. Some four months later, her neighbors William and Julianna Berlin addressed complaints about the conservatorship to the presiding probate

---

\* Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1] Brierton controlled the San Diego office of PPS and in the proceedings below accepted responsibility for any PPS breach of duty as conservator. We thus attribute PPS activities to Brierton.

judge, who appointed attorney David Allen to investigate their charges. Allen reported the results of his investigation to the court. While discounting other complaints made by the Berlins, Allen concluded the failure of PPS to sell personalty in the conservatee's estate through a noticed sale with court confirmation would have avoided the Berlins' concern as to that transaction. Allen noted an appraiser and real estate broker engaged by PPS purchased some of the personalty at the unnoticed sale. Brierton then conducted his own investigation of the sale and the purchase of items by the appraiser and broker. Concluding Allen's conclusions were erroneous, he met with Allen, who refused to change his report.

PPS then noticed a sale of the Long residence. The Berlins appeared at the sale, petitioned for PPS's removal as conservator and contended the residence was more valuable than the offer obtained by PPS. The court declined to confirm the sale. Following a hearing, the court removed PPS as conservator, determining a "violation of trust" occurred because PPS allowed the broker and appraiser to purchase items at the sale. The county public guardian was appointed successor conservator. PPS then filed its first and final account as conservator and recited the events leading to its removal and asked the court to review the sale and to make findings concerning a surcharge, if any. Brierton signed the PPS account as responsible corporate officer and filed a declaration conceding the court, in its opinion removing PPS as conservator, characterized the appraiser and broker purchase of personalty as a "violation of trust." The court approved the account, declined to review the sale, awarded ordinary fees to PPS and its counsel and denied an award of fees to PPS for resisting the removal.

In December 1980, Brierton applied for appointment to fill a vacancy on the San Diego City Council. Meanwhile, the Berlins filed allegations of PPS misconduct with the district attorney, and the San Diego Grand Jury investigated the complaints. The grand jury foreman and chairman of the committee looking into the charges wrote to William Berlin stating that while the district attorney noted PPS improprieties in the conservatorship, the evidence did not warrant criminal charges, and further, as a result of the investigation, social workers could not suggest a private conservator.

January 21, 1981, the date of the council hearing with respect to the appointment, the San Diego Union published an article reciting the allegations made by the Berlins in the conservatorship proceedings and a statement from William Berlin that Brierton was not fit for office. At the council hearing, Brierton reviewed conservatorship activities. Golding and Gorton were present. Brierton requested a one-week continuance to enable the city council further to investigate conservatorship matters. The council denied the continuance and appointed Golding to the vacancy. At the November

1981 election Brierton and Golding were run-off candidates for the seat to which Golding had been appointed. October 31, Golding mailed to the electorate a four-sheet brochure, the third page of which sets out matter claimed by Brierton to be libelous.[2] Brierton filed on November 2 his complaint against Golding, Gorton, Grand Jury Foreman William Scott Marshall, Committee Chairperson Elizabeth T. Smoot and the Berlins.[3] The election was held November 3, the next day, and Golding defeated Brierton.

The court granted Golding's and Gorton's motions for summary judgment and awarded fees to their attorneys. PPS and Brierton separately appeal. We consolidated the appeals, and affirm the grant of summary judgment and reverse the award of attorney fees.

## II

The second amended complaint pleads causes of action in conspiracy and libel as to Golding and Gorton. As the overt acts of the conspiracy concern the libel allegations, summary judgment on the libel cause of action necessarily adjudicates the conspiracy count.

## III

Golding[4] claims the publication of the brochure was privileged under Civil Code[5] section 47, subdivisions 3, 4 and 5. As we shall conclude Brierton as a public figure failed to present clear and convincing evidence of actual malice attributable to Golding in the publication of the brochure, and affirm the grant of summary judgment, we do not address Golding's claim of privilege.

We turn to the question whether one or more of the brochure statements are libelous.

Section 45 defines libel: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye,

[2] The third sheet of the brochure is attached as appendix 1 to this opinion and is referred to as the "brochure." The four-page document was not produced in the summary judgment proceedings and was not included in the record on appeal. We granted a petition for rehearing and augmented the record to include that document. As the parties and the trial court considered only the third page, we likewise limit our review to that page. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 316, pp. 327-329.)

[3] Marshall and William Berlin settled with Brierton and PPS. Smoot's demurrer was sustained and she was dismissed from the lawsuit. Golding and Gorton are the remaining defendants.

[4] As the libel count presents the same issues in Golding's and Gorton's separate appeals which we consolidated, for brevity we include Gorton when we use Golding's name.

[5] All statutory references are to the Civil Code unless otherwise specified. When referring to statutory subparts we omit repetition of the word "subdivision."

which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."

A publication which is defamatory of the plaintiff, without the necessity of explanatory matter such as inducement, innuendo or other extrinsic fact, is libel per se (§ 45a). A communication addressed to the public at large which is susceptible to an innocent interpretation as well as a defamatory one is libel per se if the communication reasonably conveys a defamatory meaning. (*Selleck* v. *Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1130 [212 Cal.Rptr. 838].) Here, the brochure trumpets Brierton's ballot statement claim of integrity and relates court findings of trust violations and district attorney conclusions of improprieties in the conservatorship proceedings. A reasonable reader could conclude the brochure's innuendoes suggest Brierton lacks integrity, cannot be trusted and took advantage of an elderly helpless person. As integrity is a lawyer's stock in trade, the brochure carries a defamatory meaning. (See *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 549-551 [343 P.2d 36]; *Selleck* v. *Globe International, Inc., supra,* at p. 1131.) We move to the issue posed by *New York Times*. Golding contends *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], compels affirmance as the record fails to show clearly and convincingly there is a triable issue of fact whether the statements were published with actual malice.

## IV

*New York Times* holds in a libel suit brought by a public official, the First Amendment requires the plaintiff to show that in publishing the defamatory material the defendant acted with actual malice—"with knowledge that it was false or with reckless disregard of whether it was false or not." Actual malice must be shown with "convincing clarity." (*New York Times, supra,* at pp. 279-280, 285-286 [11 L.Ed.2d at pp. 706, 709-710].) "Convincing clarity" has been restated as requiring a plaintiff to prove actual malice at trial by clear and convincing evidence, "i.e., evidence sufficient to permit a trier of fact to find for the plaintiff and for an appellate court to determine that the resulting judgment 'does not constitute a forbidden intrusion on the field of free expression.'" (*Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 252 [208 Cal.Rptr. 137, 690 P.2d 610].)

Summary judgment is a favored remedy in defamation cases involving actual malice (*Reader's Digest Assn., supra,* at p. 252) and the *New York Times* requirement of clear and convincing evidence must be considered on a motion for summary judgment (*Anderson* v. *Liberty Lobby, Inc.* (1986)

477 U.S. 242, 244 [91 L.Ed.2d 202, 209, 106 S.Ct. 2505, 2508]). 
Brierton, a candidate for public office, is a public figure and must meet the
clear and convincing evidence of actual malice standard of *New York Times,
Anderson* and *Reader's Digest. (Miller* v. *Nestande* (1987) 192 Cal.App.3d
191, 197 [237 Cal.Rptr. 359]; *Fisher* v. *Larsen* (1982) 138 Cal.App.3d 627,
634, 638 [188 Cal.Rptr. 216].)

 Brierton concedes the phrase "violations of trust" and the word
"improprieties" appear in court documents and the grand jury letter. He
insists, however, triable issues of fact for jury determination are to be found
in the brochure statements which give rise to defamatory inferences being
made by readers of the brochure;[6] the phrase "violations of trust" and the
word "improprieties" are extracted from entire documents; while it is true
the phrase and the word appear in court and grand jury pronouncements,
they are not in context; when read in conjunction with the content of the
entire document or other source material, they lose their pejorative charac-
ter and the reader of the entirety would not necessarily infer Brierton lacked
integrity or trustworthiness.

Brierton relies on *Good Government Group of Seal Beach, Inc.* v. *Superior
Court* (1978) 22 Cal.3d 672 [150 Cal.Rptr. 258, 586 P.2d 572]. There, the
Supreme Court affirmed denial of a motion for summary judgment brought
by a citizens group and others named as defendants in a libel action brought
by Thomas A. Hogard, a former city councilman. The group distributed a
homeowner's newsletter as a flyer to the public charging Hogard and two
colleagues had " 'extorted by blackmail' $100,000 from a development com-
pany." Omitted from the article was the fact the developer paid the money
to the city in settlement of a dispute. The court concluded whether an
ordinary reader would understand the assertion in the article was a factual
assertion of crime or a statement of opinion respecting Hogard's public
conduct was an issue of fact for the jury. The court stated the standard to be
followed by the jury in determining actual malice with respect to the publi-
cation of words which could constitute fact or opinion: "It is clear that
honest belief of the defendant is the touchstone of the privilege enunciated
in *New York Times,* and that a statement is entitled to constitutional protec-
tion if the words used are ambiguous but the defendant honestly and with-
out recklessness believes that they constitute an opinion or idea. We hold,
therefore, that in order to find the requisite malice from the publication of
ambiguous words which could constitute either fact or opinion, the jury
must find not only that the words were reasonably understood in their
defamatory, factual sense, but also that the defendant either deliberately

---

[6] We are reminded of the old story—the captain entered in the ship's log the sentence, "The
mate was drunk tonight." The mate made an entry, "The captain was sober today."

cast his statements in an equivocal fashion in the hope of insinuating a defamatory import to the reader, or that he knew or acted in reckless disregard of whether his words would be interpreted by the average reader as defamatory statements of fact." (*Good Government, supra,* at p. 684.) Brierton asserts the brochure is ambiguous in the sense that while the statements may be factually correct, i.e., they derive directly from and accurately reflect court and grand jury terminology, the defamatory inference drawn from them results in ambiguity, raising a triable issue of fact under *Good Government.*

Golding's brochure statements accurately reflect the phraseology used in the court orders and the grand jury letter. Unlike *Good Government,* the statements are not ambiguous. They are clear and direct. They are not presented as opinions. They are wholly factual. While a reasonable reader may draw a defamatory inference from the statements as presented in the brochure, Golding's subjective intent in mailing the brochure to persuade the electorate to vote for her may not be considered under *Reader's Digest.* There, Reader's Digest published an article describing how the publishers of a newspaper received the Pulitzer Prize for a series of reports critical of Synanon. The author of the magazine article relied on writings and conversations with a sociology professor and the Pulitzer Prize winners. The writer did not contact Synanon. The court, citing *New York Times* and *St. Amant* v. *Thompson* (1968) 390 U.S. 727 [20 L.Ed.2d 262, 88 S.Ct. 1323], held: "Four years later, in *St. Amant* v. *Thompson, supra,* 390 U.S. 727, the high court sought to clarify the constitutional standard. First, it explained, 'reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.' (P. 731 . . . .) The quoted language establishes a subjective test, under which the defendant's actual belief concerning the truthfulness of the publication is the crucial issue. [Citation.] This test directs attention to the 'defendant's attitude toward the truth or falsity of the material published . . . [not] the defendant's attitude toward the plaintiff.' [Citation.]" (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d 244, 256-257, fn. omitted.) *Reader's Digest* (at pp. 257-258) points out actual malice can be proven by circumstantial evidence such as failure to investigate, anger and hostility toward the defendant or reliance on sources known to be unreliable or biased against the plaintiff.

We conclude *Reader's Digest* is dispositive of the actual malice issue. The Berlins' complaints about the conservatorship triggered the court appointment of attorney Allen and his report of the purchase of personalty by the broker and appraiser retained by PPS to sell the property. The appearance of the Berlins at the hearing on the sale of the residence, the court refusal to confirm the sale, the subsequent removal of PPS as conservator—all constitute inquiries independent of Golding and resulted in court actions reflected in court proceedings from which no appeals were taken. The grand jury letter reflects district attorney inquiries into the conservatorship, the conclusion evidence was insufficient to warrant criminal charges and the establishment of policy not to appoint private conservators. Golding was not involved in any of these matters. For all we know, she first learned of trust violations and improprieties when Brierton broached them at the city council hearing on the appointment to the vacant seat.

Brierton did not produce clear and convincing evidence at the summary judgment hearing on actual malice. The record demonstrates the inquiries into the conservatorship proceedings were done by others than Golding and the results were matters of public record. Golding's investigation of those records produced accurate statements from them. Her sources were thus reliable and did not reflect bias against Brierton. The statements were not false nor made with reckless disregard of truth or falsity.

Inferences, innocent or defamatory, are drawn by people who read the brochure. *Reader's Digest* holds Golding's attitude toward Brierton is not to be considered in applying the test of her belief in the truth or falsity of the statements. It necessarily follows that a defamatory inference drawn by a reasonable reader from the true and correct phrasing and words in the statements cannot support a finding of actual malice imputed to the publisher of the statements. The drawing of the inference, innocent or defamatory, in these circumstances, is a function of the reader of the unambiguous matter. Brierton is the victim of a vicious truth.[7] The summary judgment must be affirmed.

## V

The trial court held Code of Civil Procedure[8] section 1021.7 authorized an award of attorney fees and granted Golding $26,000: "In any action for damages arising out of the performance of a peace officer's duties, brought

---

[7] The comment derives from newspaper accounts of the release of documents demonstrating a candidate in the 1987 pre-primary Democratic presidential nomination plagiarized campaign speeches and misrepresented academic achievements.

[8] From this point forward, all statutory references are to the Code of Civil Procedure unless otherwise specified.

against a peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of the Penal Code, or against a public entity employing a peace officer *or in an action for libel or slander brought pursuant to Section 45 or 46 of the Civil Code,* the court may, in its discretion, award reasonable attorney's fees to the defendant or defendants as part of the costs, upon a finding by the court that the action was not filed or maintained in good faith and with reasonable cause." (§ 1021.7, italics added.)

The attorney fee award was included in the judgment dismissing the complaint which was entered January 17, 1986. The first complaint was filed November 2, 1981.

Section 1037 (Stats. 1980, ch. 114, § 5), at the time the complaint was filed and judgment was entered, read as follows: "If the plaintiff recovers judgment in an action for libel or slander, the plaintiff shall be allowed as costs one hundred dollars ($100) to cover counsel fees in addition to the other costs. If the action is dismissed or the defendant recovers judgment, the defendant shall be allowed one hundred dollars ($100) to cover counsel fees in addition to other costs, and judgment shall be entered accordingly." Section 1037 was repealed by Statutes 1986, chapter 3777, section 17, effective January 1, 1987, after Brierton filed his notice of appeal.

Section 1021 leaves the measure and mode of compensation to attorneys to the agreement of the parties "[e]xcept as attorney's fees are specifically provided for by statute . . . ." Section 1037 as in effect at relevant times here expressly provided for an award of $100 attorney fees to defendants prevailing in libel and slander suits.

██ It thus appears section 1037, which specifically provides for attorney fee awards to any defendant, prevails over section 1021.7 arguably directed solely at peace officers. However, in the proceedings below, the parties did not brief applicability of now-repealed section 1037 and the trial court's attention was not directed to it. Brierton's opening brief on appeal makes passing reference to the section arguing its applicability. Golding's responding brief contends his failure to raise the issue below bars him from addressing it now.

██ The general rule is stated by Witkin: "Where the parties try the case on the assumption that a cause of action is stated, that certain issues are raised by the pleadings, that a particular issue is controlling, or that other steps affecting the course of the trial are correct, neither party can change

this theory for purposes of review on appeal." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 316, p. 327.) Witkin notes the doctrine is a well established rule of appellate practice, based on the notion a change of position on appeal from the "theory of trial" is unfair to the trial court and unjust to the opposing party, and is justified as an invocation of the invited error doctrine and implied waiver in the trial court by the appellant of the new theory. (9 Witkin, Cal. Procedure, *op. cit. supra.*)

The doctrine of theory of the case has been applied where the parties assumed the applicability of a particular statute or ordinance. In *Sommer* v. *Martin* (1921) 55 Cal.App. 603 [204 P. 33], a trial proceeded on the theory a Los Angeles ordinance fixing speed limits was applicable. On appeal, the defendants sought to raise the question of the applicability of a state statute. "In the trial court both parties proceeded on the theory that the traffic ordinance of the city of Los Angeles was applicable to the trial of certain features of this case. The defendants did not raise the question in the lower court; they are not therefore entitled to raise the question in this court." (*Id.* at pp. 609-610.)

While the doctrine is applied to matters involving the trial of a case, we find no reason not to apply it to this motion to tax costs. The motion raised substantive issues of attorney fee awards and application of section 1021.7 and the question whether Brierton filed or maintained the case in good faith and with reasonable cause. We conclude the motion is within the scope of the doctrine of theory of the case and hold Brierton cannot now raise on appeal the applicability of now-repealed section 1037. He invited the error in his motion to tax costs in failing to cite section 1037; his points and authorities referred only to section 1021.7; his counsel's oral argument at the hearing was addressed solely to section 1021.7. Golding responded in like fashion. The trial court was not informed about section 1037. We turn to analyses of section 1021.7.

As we have seen, section 1021 leaves the measure and mode of compensation of attorneys to the agreement of the parties "[e]xcept as attorney's fees are specifically provided for by statute . . . ." Golding contends section 1021.7 specifically provides for an award of attorney fees to any prevailing defendant in any libel or slander lawsuit, relying on the phrase "or in an action for libel or slander brought pursuant to Section 45 or 46 of the Civil Code." We disagree.

In construing a statute, a court should ascertain the intent of the Legislature to effectuate the purpose of the law (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]) and give effect to statutes according to the usual, ordinary import of the language used (*In re*

*Alpine* (1928) 203 Cal. 731, 737 [265 P. 947, 58 A.L.R. 1500]). "When used in a statute [, words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." (*Johnstone* v. *Richardson* (1951) 103 Cal.App.2d 41, 46 [229 P.2d 9].) "Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) ▮ The section 1021.7 phrase on which Golding relies is prefaced by phrases referring to actions for damages arising out of the performance of peace officer duties, brought against a police officer and actions against a public entity employing a peace officer. Because the phrase "or in an action for libel or slander" does not specifically include reference to peace officers, Golding contends the phrase authorizes an award of attorney fees to any defendant sued by any plaintiff for libel or slander.

We judicially notice the legislative history of section 1021.7, which was introduced as Senate Bill 229 on February 5, 1981, and characterized as an act to add the section to the Code of Civil Procedure "relating to peace officers." The Legislative Counsel's Digest states: "SB 229, as amended, Doolittle. Peace officers.

"Under existing law, the prevailing party in a civil action is entitled to costs which, in general, do not include attorney's fees.

"This bill would provide that *in an action for damages arising out of the performance of a peace officer's duties against a peace officer or public entity employing a peace officer, or in an action for libel or slander,* the court in its discretion . . . *may* award attorney's fees to the defendant or defendants as part of the costs upon a finding that the action was not filed or maintained in good faith and with reasonable cause." (Original italics.) The Assembly Committee on Judiciary analyzed Senate Bill No. 229. Its digest states: "This bill permits the court to award attorney's fees to the defendant in any action, including actions for libel or slander, for damages arising out of the performance of a peace officer's duties (brought against the officer or the public entity employing the officer) when the court finds that the action was not filed or maintained in good faith and with reasonable cause." (Original emphasis.)

The Judiciary Committee further commented: "1) The purpose of this bill is to reduce unwarranted lawsuits against peace officers and offset the defense costs to local agencies in the numerous civil actions brought against them."

In a document from the Assembly Office of Research, titled "PROPOSED AMENDMENTS TO SENATE BILL NO . 229, (Legis. Counsel No. 019492, M. Waters)," Legislative Counsel commented as follows: "The proposed amendments include actions for libel or slander brought against a peace officer in the provisions of the bill." (Original emphasis.)

These statements demonstrate the Legislature intended to discourage warrantless suits including defamation actions against a specific class of defendants—peace officers—and not all defendants generally.

■ Statements made in legislative committee reports are helpful in determining legislative intent. (*Southern Cal. Gas Co.* v. *Public Utilities Com.* (1979) 24 Cal.3d 653, 659 [156 Cal.Rptr. 733, 596 P.2d 1149].) There is a presumption that the Legislature adopted the proposed legislation with the intent and meaning expressed in committee reports. (*California Teachers' Assn.* v. *Governing Board* (1983) 141 Cal.App.3d 606, 613 [190 Cal.Rptr. 453].)

*City of Long Beach* v. *Bozek* (1982) 31 Cal.3d 527 [183 Cal.Rptr. 86, 645 P.2d 137] (judgment vacated and cause remanded (1983) 459 U.S. 1095 [74 L.Ed.2d 943, 103 S.Ct. 712], reiterated (1983) 33 Cal.3d 727 [190 Cal.Rptr. 918, 661 P.2d 1072]) held a city may not maintain an action for malicious prosecution against a defendant who unsuccessfully sued the city for false imprisonment and other torts· arising out of alleged police misconduct. Noting the city sought to recover costs of defense including attorney fees, the court pointed out section 1021.7 expanded the powers of trial courts to award attorney fees in actions involving peace officers, thus entitling cities to recover expenses incurred in defending baseless suits.

■ While we reject Brierton's claims made for the first time on appeal Golding's award is limited to $100 under now-repealed section 1037, we nevertheless observe the specificity of that section allowing attorney fees to any prevailing defendant militates against the argument section 1021.7, which speaks to actions concerning peace officers, allows such fees by reason of the phrase "or in an action for libel or slander," etc.

The wording of the statute itself and its legislative history persuade section 1021.7 allows award of attorney fees in actions including libel and slander involving peace officers and their employers. The section does not authorize an award of attorney fees to a defendant who prevails in a libel or slander lawsuit not involving peace officers or their employers.

Summary judgment affirmed. Award of attorney fees reversed. Each party to bear his, her or its costs on appeal.

Benke, Acting P. J., and Thaxton, J.,* concurred.

Respondents' petition for review by the Supreme Court was denied June 22, 1988.

---

* Assigned by the Chairperson of the Judicial Council.

APPENDIX 1

## BRIERTON'S BALLOT STATEMENT CLAIMS "INTEGRITY"
## BUT
## THE SAN DIEGO SUPERIOR COURT FOUND
## "VIOLATIONS OF TRUST",
## AND
## THE SAN DIEGO COUNTY DISTRICT ATTORNEY
## FOUND "IMPROPRIETIES".

**1.** Brierton was the Director and responsible corporate officer of Planned Protective Services Inc. which was responsible in a case where "violation of trust" occurred in the handling of the person and estate of an 80 year old senior citizen.
(Superior Court Case #122452)

**2.** In addition to "violation of trust" the Superior Court found Brierton's firm failed to disprove charges that the senior citizen under their care was "not being adequately clothed". (Superior Court Case #122452)

**3.** As a result of a Grand Jury inquiry into Brierton's firm's handling of this conservatorship, and the subsequent findings of "improprieties" by the District Attorney, regulations were imposed prohibiting county social workers from suggesting a private conservator, such as the Brierton firm. (Grand Jury file #81-38, March, 1981)

**4.** Even in light of and subsequent to the above, Jamie Brierton petitioned the Court, personally signing the paperwork himself, to have the legal expenses his firm had incurred in defending itself against these charges, paid out of the meager and dwindling assets of the 80 year old senior citizen his firm had been hired to protect. The Court refused. (3/11/81 Superior Court case #122452)