[Nos. A039701, A039830. First Dist., Div. Three. Mar. 26, 1990.]

ASBESTOS CLAIMS FACILITY et al., Plaintiffs and Appellants, v. BERRY & BERRY, Defendant and Respondent.

**COUNSEL**

Kelly C. Wooster, Stephen M. Snyder, Thomas M. Peterson, Steven Allen Childress, Brobeck, Phleger & Harrison, Eliot S. Jubelirer, Morgenstein & Jubelirer, James N. Penrod and Hassard, Bonnington, Rogers & Huber for Plaintiffs and Appellants.

Elaine M. McMahan, Peter R. Gilbert, Carolyn Collins, Linda Fung and Berry & Berry for Defendant and Respondent.

**OPINION**

**STRANKMAN, J.**—Appellants in these consolidated appeals are the Asbestos Claims Facility (ACF) and its members, several asbestos manufacturers who are defendants in numerous asbestos-related personal injury and wrongful death actions filed in the Superior Courts of Alameda County (the Alameda court) and the City and County of San Francisco (the San Francisco court). Respondent is Berry & Berry, an Oakland law firm. In complex asbestos litigation in both counties, the trial courts issued similar general orders appointing respondent as designated defense counsel to coordinate the scheduling of numerous discovery-related activities on behalf of all defendants. Both orders provided for the allocation of costs and fees for respondent's services among all defendants in a given case. After a fee dispute arose between respondent and appellants, the trial courts in both counties granted respondent's motions to compel appellants to pay certain

past due bills immediately and all future bills within 30 days. Appellants have appealed from both orders.

We have concluded that the designated defense counsel system created by the trial courts' general orders did not interfere with appellants' right to counsel of their choice. Nevertheless, we have also concluded that the orders compelling the payment of fees must be reversed and remanded for an evidentiary hearing on whether the services for which respondent billed appellants exceeded the scope of the general orders and whether the fees charged were reasonable.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Introduction*

The Judicial Council has adopted suggested procedures for processing complex civil cases which require specialized management to avoid placing unnecessary burdens on the trial courts or litigants. (Cal. Standards Jud. Admin., § 19 (Deering's Cal. Ann. Codes, Rules (Appen.) (1988 ed.) pp. 620-621 (hereafter Standards).) The complex litigation procedure is intended to facilitate pretrial resolution of evidentiary and other issues, and to minimize the time and expense of lengthy or multiple trials. (*Vermeulen* v. *Superior Court* (1988) 204 Cal.App.3d 1192, 1195-1196 [251 Cal.Rptr. 805].) The San Francisco court and the Alameda court have each designated all cases filed in their respective courts involving death and injury due to asbestos exposure as complex litigation under section 19 of the Standards. In each court, a procedure has been established for the issuance of general orders applicable to every asbestos case in that court.

### *No. A039701*

Before 1986, there was no court-ordered defense discovery coordination system for asbestos litigation in either county. Instead, defendants voluntarily participated in an informal cooperative program, with respondent coordinating and scheduling medical discovery. Disagreement concerning that voluntary program arose in late 1985, after several asbestos manufacturer defendants formed the mutual defense association known as ACF, which then proposed its own discovery program.[1]

Appellants and the non-ACF defendants were unable to agree on a discovery program. In December 1985, respondent and others requested the

---

[1] The ACF defendants are also sometimes referred to as the Wellington group or Wellington defendants. (See *Duty* v. *Abex Corp.* (1989) 214 Cal.App.3d 742, 746, fn. 2 [263 Cal.Rptr. 13].)

San Francisco court to designate respondent as "designated counsel" to coordinate and schedule the discovery activities of all defendants, with the costs to be shared among all defendants. Appellants objected, and sought confirmation of their own counsel as designated counsel for the coordination of a joint defense medical discovery program. Appellants proposed to coordinate all scheduling of depositions and medical screenings, at no charge to the other defendants. They also proposed an equal sharing of costs such as reporters' fees and experts' fees with the non-ACF defendants, but argued that each codefendant should pay its own legal, paralegal, or law clerk fees.

In March 1986, the San Francisco court issued "General Order No. 41: Designation of Defense Counsel for Discovery Purposes." The stated purpose of the order was to: "A) Promote a cost-effective, simple but competent system for defendants to acquire information necessary in order to facilitate the evaluation of these cases; [¶] B) Curtail and prevent unnecessary and repetitious discovery whenever possible; [¶] C) Provide continuity, efficiency and economy in completing discovery procedures; [¶] D) Encourage delegation of work responsibility and sharing of costs to avoid unnecessary duplication and to reduce expense to the litigants. [¶] E) Bring asbestos litigation to early and meaningful settlement negotiations in each case."

General Order No. 41 established a Defense Discovery Committee (the Committee), composed of one attorney selected by appellants and one attorney selected by all other defendants. The order also assigned respondent to serve as "designated defense counsel" to perform the following functions on behalf of all defendants: (1) schedule and notice plaintiffs' depositions, after receiving a list of cases selected for deposition by the Committee; (2) schedule defense medical examinations and preliminary screenings and any other necessary testing or medical reviews, after receiving the Committee's determination of the nature and priority of such examinations and screenings; (3) review plaintiffs' answers to interrogatories and initiate procedures, including necessary stipulations, authorizations, and waivers, to obtain medical and employment records and related materials; (4) store and provide reasonable access to radiographs, pathology materials, and other related medical evidence; (5) schedule, notice, and coordinate depositions of plaintiffs' designated experts and jointly designated defense experts, after receiving the Committee's determination which plaintiffs' experts should be deposed; (6) file and serve a joint defense designation of medical experts on behalf of those defendants who so authorize; and (7) schedule and coordinate mandatory and voluntary judicially supervised settlement conferences.

The order also explicitly limited respondent's authority, stating: "[Respondent] is appointed solely to coordinate the scheduling of the activities

provided herein and shall not be deemed an attorney for any defendant solely as a result of such activities. Coordinating does not include: [¶] (1) Case evaluation or medical evaluation; [¶] (2) Preparation of motions except, with the concurrence of the Defense Discovery Committee, motions to compel IME's [independent medical examinations], production of medical records, or for failure to appear at deposition; [¶] (3) Court appearances or deposition appearances except as necessary in conjunction with above."

The order included an "opt-out" provision: respondent would have no scheduling responsibility in any case in which all defendants elected to proceed without that firm.

Concerning allocation of fees and costs, the order stated: "Costs and reasonable fees for the above functions will be allocated amongst all defendants in a given case 50% to Asbestos Claims Facility signatories and 50% to all other defendants. . . . Fees shall include professional fees charged at customary rates for performing the above services required of them as designated defense counsel subsequent to this General Order." For billing purposes, the order required each defendant to provide respondent with a list of active cases, to be updated monthly. Respondent was to bill defendants monthly.

In February 1987, appellants moved in the San Francisco court for an accounting of fees and costs billed and collected to date by respondent. Among other information, appellants requested breakdowns separately showing fees for attorney and nonattorney time for each function billed to defendants. In reply, respondent filed a memorandum acknowledging the court's right to an accounting, explaining in some detail the functions it performed, and providing an average cost per function per case. The total average case cost for respondent's services was $951. On July 8, 1987, the court ordered an accounting.

While the motion for an accounting was pending, respondent moved to compel appellants to provide their case lists on time, pay past due January and February 1987 bills ($149,763.97) within 7 days, and pay all future bills within 30 days of receipt. Respondent argued that appellants' payments were consistently overdue, and sought sanctions.

Appellants' memorandum in opposition to the motion urged that (1) respondent had engaged in activities outside the scope of and precluded by the general order; (2) to the extent that order purported to appoint respondent as their counsel and order the payment of attorney fees, the order was in excess of the court's jurisdiction, void, and violative of due process; and (3) the motion was not factually supported with the requisite particularity.

On July 27, 1987, the San Francisco court granted respondent's motion, except for its request for sanctions.

*No. A039830*

A similar sequence of events occurred in the Alameda court. In April 1986, that court issued a general order (the Interim Standing Order) which was almost identical to General Order No. 41, and which also assigned respondent as designated defense counsel to perform specified discovery-related functions. Originally effective for only 120 days, that order was later extended through January 19, 1987.

In early January 1987, respondent moved for another extension of the Interim Standing Order. Its supporting memorandum enumerated what it perceived to be its duties under the order. The memorandum also stated that upon request of a defendant, respondent would provide additional services, including case evaluations and complete summarization, analysis, and evaluation of medical and employment records; those additional services were not part of the court-mandated program and were provided on a " 'shared cost' " basis.

Several non-ACF defendants joined in respondent's motion to extend the general order, and submitted supporting declarations. Many of those declarations expressed concern about conflict of interest problems which would result if appellants acted as designated defense counsel instead of respondent. Counsel for defendants Gatke Corporation, E. J. Bartells Co., United States Mineral Products Company, and A. P. Green Refractories Co. declared, "We feel that it is important that the Berry firm, which does not regularly represent any one client, continue to act as designated defense counsel on behalf of all defendants . . . ." The declaration stated that having counsel for the [ACF] defendants act as designated defense counsel ". . . would not work well. There is an inherent conflict of interest in having counsel who regularly represent certain defendants only . . . also arrange all discovery . . . ." Counsel for defendants Carlisle Corporation and Hamilton Materials, Inc., declared that the entity performing the scheduling and coordination should be independent of the firms representing appellants, as the interests of the ACF defendants and other defendants are often different and conflicting. Counsel for defendant John Crane-Houdaille, Inc., declared in part that at times the interests of the defendants conflict. Counsel for defendant W.R. Grace & Company urged that respondent, an "independent law office," continue as designated defense counsel, and expressed concern that a conflict of interest would arise if appellants took on that responsibility. Counsel for defendant Chrysler Motors Corporation declared that it had participated in respondent's " 'shared costs' "

program of case evaluation and analysis of medical records, and that "insurmountable conflicts of interest would arise if [the functions of designated defense counsel] were performed by an office representing any separate party or parties in the litigation of liability issues."

Appellants opposed the extension in the Alameda court, in part on the ground that the procedure was unnecessary and unduly expensive. On February 5, 1987, the trial court extended the Interim Standing Order for one year.

On June 24, 1987, respondent moved in the Alameda court to compel appellants to pay their outstanding January and February 1987 bills and for other relief. Appellants opposed the motion. As did the San Francisco court, the Alameda court ordered appellants to pay past due bills within seven days and all future bills within thirty days of receipt. Appellants appealed from that order.

## THE INHERENT POWERS OF TRIAL COURTS

Before we consider appellants' challenge to the courts' fee orders, we dispose of two arguments raised by respondent which do not need extended discussion. ■ Respondent argues that the appeals are from nonappealable interim orders, but a final order on a collateral matter directing the payment of money is appealable. (See *I. J. Weinrot & Son, Inc.* v. *Jackson* (1985) 40 Cal.3d 327, 331 [220 Cal.Rptr. 103, 708 P.2d 682].) Respondent also urges that appellants are precluded by principles of res judicata or collateral estoppel from challenging the courts' orders because this court has summarily denied appellants' writ petition which raised identical issues. This argument is frivolous. ■ "The denial without opinion of a petition for a writ of mandate or prohibition is not res judicata except when the sole possible ground of denial was on the merits or it affirmatively appears that the denial was intended to be on the merits. [Citations.]" (*People* v. *Medina* (1972) 6 Cal.3d 484, 491, fn. 6 [99 Cal.Rptr. 630, 492 P.2d 686].) Nothing about this court's denial of appellants' writ petition indicates that it was a decision on the merits.

With that preface, we turn to appellants' arguments. Appellants contend that the fee orders must be reversed because the underlying orders establishing the designated defense counsel system were unlawful. According to appellants, that system was unauthorized by case law, statute, or court rule. Appellants also insist that the orders appointing and directing the payment of fees to designated defense counsel forced them to accept and pay for legal services from lawyers whose representation they did not want. As we will

discuss, however, appellants ignore the inherent powers of trial courts and overstate the limited duties assigned to respondent.

■ In addition to their inherent equitable power derived from the historic power of equity courts, all courts have inherent supervisory or administrative powers which enable them to carry out their duties, and which exist apart from any statutory authority. (*Bauguess* v. *Paine* (1978) 22 Cal.3d 626, 636-637 [150 Cal.Rptr. 461, 586 P.2d 942]; *Peat, Marwick, Mitchell & Co.* v. *Superior Court* (1988) 200 Cal.App.3d 272, 287-288 [245 Cal.Rptr. 873].) "It is beyond dispute that 'Courts have inherent power . . . to adopt any suitable method of practice, both in ordinary actions and special proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council.' [Citation.]" (*Citizens Utilities Co.* v. *Superior Court* (1963) 59 Cal.2d 805, 812-813 [31 Cal.Rptr. 316, 382 P.2d 356], fn. omitted.) That inherent power entitles trial courts to exercise reasonable control over all proceedings connected with pending litigation, including discovery matters, in order to insure the orderly administration of justice. (See *Hays* v. *Superior Court* (1940) 16 Cal.2d 260, 264-265 [105 P.2d 975].) "Courts are not powerless to formulate rules of procedure where justice demands it." (*Adamson* v. *Superior Court* (1980) 113 Cal.App.3d 505, 509 [169 Cal.Rptr. 866], citing *Addison* v. *State of California* (1978) 21 Cal.3d 313, 318-319 [146 Cal.Rptr. 224, 578 P.2d 941].) The Legislature has also recognized the authority of courts to manage their proceedings and to adopt suitable methods of practice. (See Code Civ. Proc., §§ 128, 187.)

The Judicial Council's recommended standards for processing complex litigation presuppose the existence of these inherent managerial powers. Section 19 of the Standards begins by urging that "judicial management" should begin early and be applied continuously and actively. (Standards, § 19(a).) The corresponding Advisory Committee Comment states that the court should "assume an aggressive role at the earliest possible time to efficiently move the case to settlement or trial." (See Judicial Council of Cal., Advisory Com. com. to Standards, § 19(a).)

Concerning the management of pretrial activity, section 19 of the Standards recommends a preliminary trial conference at the earliest possible date, in part to "suppress unnecessary and burdensome discovery procedures in the course of preparing for trial . . . ." (Standards, § 19(g), (h).) Among the subjects suggested for consideration at the conference are the scheduling of discovery proceedings and the appointment of "liaison counsel." (Standards, §§ 19(g)(3), (6).) On the control of discovery, the Advisory committee's Comment states: " 'Courts handling complex cases should exercise effective, direct control over the discovery process. . . .' " (See Judicial Council of Cal., Advisory Com. Com. to Standards, *supra*, § 19(h).)

The extent of the trial court's inherent managerial power in complex civil litigation has not yet been delineated by this state's reviewing courts. However, federal courts have long recognized that active and effective judicial management of such litigation is crucial. One federal court has explained, "Managerial power is not merely desirable. It is a critical necessity. . . . We face the hard necessity that, within proper limits, judges must be permitted to bring management power to bear upon massive and complex litigation to prevent it from monopolizing the services of the court to the exclusion of other litigants." (*In re Air Crash Disaster at Florida Everglades* (5th Cir. 1977) 549 F.2d 1006, 1012, fn. omitted.)

Several federal courts have concluded that in complex civil litigation, the trial court's inherent power extends to the appointment of general or liaison or lead counsel to perform certain functions on behalf of several parties with common interests, and that such an appointment does not interfere with a party's right to select its own counsel. For example, in *MacAlister v. Guterma* (2d Cir. 1958) 263 F.2d 65, the court concluded that in a proper case, a trial court could order pretrial consolidation of several stockholders' derivative actions and appoint a general counsel to supervise and coordinate the conduct of the plaintiffs' cases. The court emphasized, "By such a procedure, one general counsel is not substituted for the counsel of each party plaintiff's choice." (*Id.*, at p. 68.) The court added, "The benefits achieved by consolidation and the appointment of general counsel, i.e. elimination of duplication and repetition and in effect the creation of a coordinator of diffuse plaintiffs through whom motions and discovery proceedings will be channeled, will most certainly redound to the benefit of all parties to the litigation. *The advantages of this procedure should not be denied litigants in the federal courts because of misapplied notions concerning interference with a party's right to his own counsel.* [Citation.]" (*Id.*, at p. 69, italics added.)

Another federal court has held that in a complex consolidated case, the trial court's inherent supervisory powers entitled it both to designate a lead counsel to handle pretrial activity where the interests of the coparties coincided and to order compensation for that lead counsel. (*In re Air Crash Disaster at Florida Everglades, supra*, 549 F.2d at pp. 1014-1016.) In that case, which involved multiple claims arising out of an airplane crash, the trial court appointed a committee of plaintiffs' counsel in part to lead and coordinate discovery. Largely as a result of the committee's work, defendant airline conceded liability on the eve of trial, and many cases settled. The trial court ordered each noncommittee plaintiffs' attorney to pay a part of his or her own fee to the committee. (*Id.*, at p. 1008.)

The reviewing court held that the trial court had the inherent power both to appoint the committee and to direct its compensation in that manner.

(549 F.2d at p. 1012.) Concerning the order for compensation, the court reasoned that the power to appoint lead or liaison counsel was illusory if dependent on counsel's performing the desired duties voluntarily. " 'Liaison counsel . . . without the comfort of any order or arrangement covering sharing costs of compensation . . . does not feel bound by any particular obligation to any other counsel, [and] pursues his own discovery primarily for his own benefit and without particular concern for the interest [or] needs of other parties.' [Citation.]" (*In re Air Crash Disaster at Florida Everglades, supra,* 549 F.2d at p. 1016.)

The court also discussed in some detail the Manual for Complex Litigation (rev. ed. 1973) (the Manual), a set of suggestions prepared by federal judges for both courts and lawyers concerning how a complex case might be organized and administered.[2] The court considered it insignificant that the precise procedure utilized by the trial court was not set forth in the Manual, and explained that while the Manual recommends procedures, it neither creates rights, grants power, nor limits courts to its suggested procedures; instead, the Manual contemplates and is intended to stimulate the use of innovative procedures by trial courts. (549 F.2d at p. 1016.)

Finally, the reviewing court stated that the trial court's inherent power to order compensation was "reinforced" by the body of law concerning the inherent equitable power of a trial court to allow counsel fees out of the proceeds of a fund that had been created, increased, or protected by successful litigation. (549 F.2d at p. 1017.)

Contrary to appellants' assertion, the trial court's authority to appoint and order compensation for lead or liaison counsel has not been limited to cases involving the creation of a fund from which counsel will be paid, at least when the court has authorized the rendition of services which can be characterized primarily as administrative rather than legal. In *In re FTC Line of Business Report Litigation* (D.C. Cir. 1980) 626 F.2d 1022 [200 App. D.C. 158], several corporations filed civil actions challenging certain federal programs. The trial court appointed one law firm as liaison counsel for plaintiffs, to receive documents, coordinate appearances of counsel, call meetings among plaintiffs' counsel, and perform other court-authorized administrative functions. The court also ordered reimbursement to liaison counsel from all plaintiffs. After a dispute developed over the billing, the

---

[2] That Manual has been superseded by the Manual for Complex Litigation, Second (1985). While the Manual is without the force of law, the Federal Rules of Civil Procedure have codified some of the Manual's procedures, and the notes of the advisory committee on the rules suggest the use of certain of those procedures in complex cases. (See Fed. Rules Civ.Proc., rule 16, advisory committee's note, 28 U.S.C.; see Simons, *The Manual for Complex Litigation: More Rules or Mere Recommendations?* (1988) 62 St. John's L.Rev. 493.)

trial court concluded that the reimbursement sought was for activities within the scope of the order and granted liaison counsel's motion for an order directing payment. (*Id.*, at pp. 1025-1027.)

On appeal from that order, the reviewing court held that the trial court's inherent power to control its docket entitled it both to appoint liaison counsel and to assure his or her payment. (626 F.2d at p. 1027.) However, the court found it unnecessary to consider whether the amounts billed were not properly awardable because they were attorney fees. It rejected the argument that the amounts billed were attorney fees simply because they represented services performed by an attorney at the same hourly rate charged for any legal work for a paying client. The court reasoned that the nature of the work performed rather than the amount demanded for it determines whether a charge is properly denominated an attorney fee. (*Id.*, at p. 1027, fn. 28.) It remanded for the trial court to clarify whether its order encompassed payment for legal as well as administrative activities, and to make findings on whether the reimbursement sought was for administrative activities within the scope of the orders and whether the amounts requested were reasonable. (*Id.*, at pp. 1028-1029.)

With that background, we examine the general orders which led to the orders for payment of fees in the present cases. It is difficult in the abstract to draw a bright line between services which are primarily administrative and those which are legal. Here, however, the general orders were meticulously drafted to delineate respondent's duties and circumscribe its authority. Respondent was not authorized to evaluate cases, set priorities, formulate or present positions on substantive or procedural issues for appellants, or present written or oral arguments to the court. Respondent was not authorized to bind appellants in any aspect of the litigation without their consent. Instead, respondent's duties were limited to scheduling and coordinating. To be more specific, respondent was authorized to schedule and notice plaintiffs' depositions only after the Defense Discovery Committee determined which plaintiffs should be deposed, and in what priority. Respondent was authorized to schedule medical examinations only after the Committee determined the nature and priority of those screenings. Respondent was authorized to schedule, notice, and coordinate depositions of expert witnesses only after the Committee determined which should be deposed. Respondent was not authorized to prepare motions except with the concurrence of the Committee, of which the ACF was a member. Respondent was not authorized to follow up on record requests unless requested to do so by a defendant, at that defendant's expense.

█ The enumerated functions assigned to respondent were primarily administrative in nature, and the effect of the orders was not to substitute

respondent for appellants' attorney of choice. Complex asbestos litigation involves over 2,000 cases in Alameda County and a similar number in San Francisco. Given the burdens placed on the judicial system by that litigation, we conclude that the trial courts acted well within their inherent managerial powers when they appointed respondent as designated defense counsel to perform the limited functions specified in those orders for all defendants, even over the objection of appellants, and when they ordered the allocation among all the defendants of the costs and reasonable fees for the services rendered.

## THE MOTION TO COMPEL PAYMENT OF FEES

Appellants contend that even if the designated defense counsel system was lawful, respondent billed them for activities which were not authorized by the general orders. Appellants also argue that nothing authorized respondent to seek an order, by motion, compelling payment of fees allegedly due; according to appellants, respondent should have filed a separate action or sought arbitration to collect the fees. Finally, appellants contend that even if respondent was entitled to seek enforcement of the general orders by motion, respondent made an inadequate showing in support of its fee request.

As we have already discussed, the trial court has inherent power to create new procedures if necessary in pending cases. (*Citizens Utilities Co.* v. *Superior Court, supra*, 59 Cal.2d at pp. 812-813; *James H.* v. *Superior Court* (1978) 77 Cal.App.3d 169, 175 [143 Cal.Rptr. 398].) The Legislature has recognized that power in Code of Civil Procedure section 187.[3] The court also has inherent power to compel obedience to its judgments and orders, and the Legislature has expressly recognized that power in Code of Civil Procedure section 128.[4] We have already concluded that the trial courts had power to appoint respondent as designated defense counsel for the limited purposes specified in the general orders and to direct that respondent be paid by all defendants benefited by its services. ■ We also conclude that the trial courts were entitled to enforce and give effect to their general orders by conducting a hearing on respondent's motion to compel payment, even if that procedure was not specifically provided for by statute.

---

[3] Code of Civil Procedure section 187 provides in pertinent part: "When jurisdiction is . . . conferred on a court . . . all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code."

[4] Code of Civil Procedure section 128 provides in pertinent part: "(a) Every court shall have the power to do all of the following: [¶] (4) To compel obedience to its judgments, orders, and process, . . . in an action or proceeding pending therein."

However, a rule or procedure adopted by a trial court must be consistent with constitutional due process. (See *McLaughlin* v. *Superior Court* (1983) 140 Cal.App.3d 473, 481-483 [189 Cal.Rptr. 479] [local rule authorizing mediator to make recommendations in child custody proceedings invalid if party not permitted to cross-examine mediator].) Moreover, the fees sought here are analogous to fees for legal services, and conclusory factual assertions concerning services performed are inadequate to justify an award of such fees. (See, e.g., *Martino* v. *Denevi* (1986) 182 Cal.App.3d 553, 558-559 [227 Cal.Rptr. 354].)

*Estate of Fulcher* (1965) 234 Cal.App.2d 710 [44 Cal.Rptr. 861] is instructive on the showing which should be made to justify an award of fees. In that case the court reversed an order awarding extraordinary fees to the executrix of an estate and her attorneys, as the petition did not adequately specify the nature of the services provided. The court stated, "The attorneys' bare statement that 'they have reasonably expended approximately four hundred (400) hours of their time on legal matters concerning the estate which were, are and will be of a nature to qualify said services as extraordinary,' standing alone, and failing to disclose the time consumed in performing each individual item of service is in no manner enlightening nor persuasive and in the case at bench insufficient as the basis for a determination by the trial court of the amounts to be awarded." (*Id.*, at p. 717.)

In addition to these general principles concerning the showing which must be made to justify an award of fees, it is important and appropriate here to emphasize again the trial court's obligation to "continuously and actively" manage complex litigation. (See Standards, § 19.) When liaison counsel or designated defense counsel has been appointed, the court's managerial responsibility necessarily includes ongoing monitoring of that appointee. If bills submitted by designated defense counsel are challenged, close scrutiny by the trial court is essential to ascertain that compensation is not being sought for work outside the scope of the appointment, or for unnecessary or duplicative activities. (See, e.g., *In re Air Crash Disaster at Florida Everglades, supra*, 549 F.2d 1006 [although the trial court had authority to award compensation to lead or liaison counsel, matter was remanded for a hearing on the fees at which liaison counsel should offer relevant evidence and be available for cross-examination].)

The general orders in the present case stated that respondent was entitled to reasonable fees charged at customary rates for performing the required services. Respondent's motion to compel payment of fees in the San Francisco court sought payment of fees for services rendered in January and February 1987. In support of that motion, respondent submitted a one-page "Professional Billing System Summary Report" simply listing its total fees

and expenses in January and February. Respondent also apparently submitted exemplars of bills sent in the past, but no copies of bills for the two months in issue. Respondent failed to specify what services were performed, or provide any basis upon which the trial court could have concluded either that the services rendered were within the scope of the order or that fees were reasonable. Respondent's showing in support of its motion in Alameda County was similarly deficient. Respondent claims that its fees were documented by "thousands of detailed invoices which included all the information required." While detailed invoices may have been sent to appellants, respondent does not state and the record does not show that those invoices or any equivalent documentation was submitted *to either trial court* on the motions to compel payment of fees.

Respondent cites absolutely no authority which supports its assertion that the showing made to either trial court in the present cases was sufficient to justify the orders compelling payment of past due fees, given appellants' objection that the services performed exceeded the scope of the order. On the records before us, it is impossible to assess whether respondent's January and February 1987 billings were for administrative activities within the scope of the order, or whether the fees charged were reasonable. Accordingly, the order must be reversed and remanded for a rehearing.

On rehearing, even if the trial courts again find in favor of respondent on both issues, they should not order the payment of all future bills within 30 days, as did their original orders. While respondent's bills should ordinarily be paid promptly, appellants must retain the right to a hearing should they question the services provided or the reasonableness of the fees. That portion of the orders concerning future bills appears to compel timely payment regardless of whether the services performed were authorized or whether the fees charged were reasonable. Respondent cites and we have found no authority which would justify such an absolute order.

### CONFLICT OF INTEREST

Appellants also contend that the motions to compel payment of fees should have been denied because a law firm which represents conflicting interests cannot recover fees for its services. Appellants argue that respondent improperly acted both as designated defense counsel and as counsel to various non-ACF defendants in asbestos litigation whose interests conflicted with those of appellants.

Former rule 5-102(B) of the Rules of Professional Conduct of the State Bar of California provided that "[a] member of the State Bar shall not represent conflicting interests, except with the written consent of all parties

concerned." (See 23 West's Cal. Codes Ann. Rules, pt. 2 (1981 ed.) p. 565.)[5] ■ "An attorney's simultaneous representation of clients with differing interests poses the classic conflict situation. A client is entitled to his attorney's unimpaired loyalty and the danger is that an attorney representing conflicting or potentially conflicting interests will be tempted to favor one client over the other. [Citation.]" (*Johnson* v. *Haberman & Kassoy* (1988) 201 Cal.App.3d 1468, 1475 [247 Cal.Rptr. 614].) " '[It does not] matter that the intention and motives of the attorney are honest. The rule is designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent.' " (*People* ex rel. *Deukmejian* v. *Brown* (1981) 29 Cal.3d 150, 159 [172 Cal. Rptr. 478, 624 P.2d 1206].) Nonlegal services provided by a lawyer may be subject to the rules governing conflicts of interest, as "[p]rofessional responsibilities do not turn on whether a member of the State Bar acts as a lawyer." (*William H. Raley Co.* v. *Superior Court* (1983) 149 Cal.App.3d 1042, 1046-1047 [197 Cal.Rptr. 232].)

■ Nevertheless, it is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court. (*Doers* v. *Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261].) For example, when the parties try a case on the assumption that certain issues are raised by the pleadings and are controlling, neither party can change theories on appeal. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 316, p. 327.) Unless the facts are undisputed and the question is solely one of law, permitting a change of theories on appeal would be unfair both to the trial court and to the opposing litigant. (*Richmond* v. *Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874, 879 [242 Cal.Rptr. 184].) ■ This theory of the case doctrine is applicable to a motion for an award of attorney fees. (See *Planned Protective Services, Inc.* v. *Gorton* (1988) 200 Cal.App.3d 1, 13 [245 Cal.Rptr. 790].)

■ Courts have recognized several methods by which an issue of attorney conflict of interest may be raised, among them as a defense in the

[5] The rules were revised effective May 27, 1989. Former rule 5-102 has been substantially restated in rule 3-310(A) and (B). Rule 3-310(A) provides: "If a member has or had a relationship with another party interested in the representation, or has an interest in its subject matter, the member shall not accept or continue such representation without all affected clients' informed written consent." Rule 3-310(B) provides: "A member shall not concurrently represent clients whose interests conflict, except with their informed written consent." (See West's Cal. Rules of Court, State (1989 desk copy) pp. 861, 868.)

attorney's action to recover fees. (See, e.g., *Jeffry* v. *Pounds* (1977) 67 Cal.App.3d 6, 10-12 [136 Cal.Rptr. 373]; *Goldstein* v. *Lees* (1975) 46 Cal.App.3d 614, 618-624 [120 Cal.Rptr. 253]; 1 Witkin, Cal. Procedure (3d ed. 1985) Attorneys, § 105, p. 124.)[6] In such a case, the attorney's claim for fees may not be allowed if it is established that he or she undertook the representation of conflicting interests without the written consent of both parties. (See *Jeffry, supra,* at pp. 11-12.) ▪▪▪ Thus in the present case, appellants could have asserted their conflict of interest claims as a defense in respondent's motions to compel payment of fees.

Although respondent filed those motions both in the San Francisco and Alameda courts, appellants did not oppose the motions on conflict of interest grounds in either court. Insisting that they did raise the issue, appellants point to one sentence in a section of their Alameda County memorandum enumerating respondent's allegedly unauthorized activities. In that memorandum, appellants complained that respondent had no authority to " 'prioritize' " scheduling, and stated, "This problem becomes particularly acute because [respondent] represents, as counsel, non-ACF defendants individually." This single tangential statement falls far short of an assertion that respondent was not entitled to be paid because it represented defendants whose interests conflicted with those of the ACF defendants during the two-month period at issue in the fee motion. Because appellants did not adequately raise the conflicts issue in the trial court, this court cannot evaluate the question for the first time on appeal.

However, our conclusion that the issue is not properly before us should not be construed to mean that we see no conflict of interest problem in the designated defense counsel system as it is apparently being operated in complex asbestos litigation in both San Francisco and Alameda counties. As we have discussed, those federal cases analyzing the trial court's inherent power in complex litigation hold either expressly or impliedly that the court has power to appoint lead or liaison counsel *on behalf of parties who share common interests.* (See *MacAlister* v. *Guterma, supra,* 263 F.2d at pp. 68-69; *In re Air Crash Disaster at Florida Everglades, supra,* 549 F.2d at pp. 1014-1016.) Respondent cites no case in which lead or liaison counsel has been appointed to perform even limited administrative functions on behalf of parties whose interests are adverse.

We note also that the Manual alerts counsel in that litigation to the possibility of their disqualification because "an adverse party" is a current

---

[6] Other methods of raising the issue include a motion in the trial court to disqualify the attorney from acting for the adverse party (*Big Bear Mun. Water Dist.* v. *Superior Court* (1969) 269 Cal.App.2d 919, 925 [75 Cal.Rptr. 580]) or a separate action to enjoin the adverse representation (*Wutchumna Water Co.* v. *Bailey* (1932) 216 Cal. 564, 567, 574 [15 P.2d 505]). Also, a trial court has the power to disqualify an attorney on its own motion. (See *People* v. *Superior Court (Greer)* (1977) 19 Cal.3d 255, 261, fn. 4 [137 Cal.Rptr. 476, 561 P.2d 1164].)

or former client; that warning extends not just to persons and companies formally aligned as adverse parties, but to others such as coparties whose posture might change as the litigation progresses. The Manual cautions firms to guard against the creation of conflicts by accepting new clients during litigation, and stresses that this safeguard is of particular importance to counsel seeking to represent a class or act as lead counsel in multi-party litigation. (Manual for Complex Litigation, Second, *supra*, § 20.23, pp. 21-23.)

We recognize that spurious motions to disqualify are sometimes filed to harass and delay. Nevertheless, in our view, respondent risks disqualification or loss of fees if it serves both as designated defense counsel and represents individual defendants in asbestos cases without the written consent of all concerned. That respondent sees no potential conflict of interest problems in performing both these services is particularly surprising, given the non-ACF defendants' vehement opposition on conflict of interest grounds to the appointment of appellants as designated defense counsel. (See *ante*, at pp. 17-18.) We are well aware that the general orders did not address whether or under what circumstances designated defense counsel could also represent individual defendants, but that silence should not be taken by respondent as permission to treat its ethical obligations cavalierly.

## Disposition

The orders are reversed and remanded for rehearing. Each party to bear its own costs.

White, P. J., and Barry-Deal, J., concurred.

A petition for a rehearing was denied April 24, 1990, and appellants' petition for review by the Supreme Court was denied June 7, 1990.